UNITED STATES, Appellee,

v.

Keith Adam RICHARDSON,
Defendant, Appellant.

No. 92–2307.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1993.

Decided Jan. 28, 1994.

---

James C. Munch, III, with whom Marvin H. Glazier, and Vafiades, Brountas & Kominsky, Bangor, ME, were on brief, for appellant.

Michael M. DuBose, Asst. U.S. Atty., with whom Jay P. McCloskey, U.S. Atty., Portland, ME, was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge. ·

BOWNES, Senior Circuit Judge.

Defendant-appellant, Keith A. Richardson, was tried and convicted by a jury of conspiring to transport, possess, and sell stolen property in interstate commerce in violation of 18 U.S.C. §§ 371, 2314, 2315 and 2. His appeal raises four issues: (1) whether the court erred in admitting into evidence written statements of a co-conspirator; (2) whether there was sufficient evidence for defendant's conviction; (3) whether the court erred in giving the jury a willful blindness instruction; and (4) whether the court erred in sentencing defendant. We affirm across the board.

### Factual Summary

Defendant and his father operated a business in Waterville, Maine, called the Skowhegan Coin and Stamp Corporation, from August 1989 through June of 1991. During this time defendant bought and sold hundreds of thousands of dollars worth of jewelry mailed to him from Arizona by one Chip Bond (a/k/a John MacLean). The jewelry packages were sent via Federal Express with fictitious return names and addresses. Defendant paid for the jewelry initially in cash and then by postal money orders made out to "cash." Both types of payment were sent via Federal Express. Bond became the target of a joint federal and state investigation into numerous residential burglaries involving thefts of jewelry in the Phoenix area of Arizona. Several pieces of jewelry stolen from the Phoenix vicinity were traced to defendant in Maine. In March 1991, Bond telephoned defendant and told him that "they" were under FBI surveillance, and he accused defendant of being an informant. Defendant steadfastly maintained that until he received the phone call he was totally unaware that the packages shipped to him by Bond contained stolen jewelry.

### The Admission of the Alleged Hearsay Statements

The disputed statements (Ex. 22–A) were letters from Bond to defendant sent along with the jewelry. They discussed, described, and evaluated the jewelry contained in the packages. Some of them gave specific directions for sale and payment. The evidence showed the letters were all written by the same individual, who signed some of them as "Chip." Defendant was addressed as "Keith." Expert testimony, agreed to by stipulation, established that both Bond's and defendant's fingerprints were on the documents. The government obtained the letters from the Skowhegan Coin and Stamp Corporation pursuant to a subpoena for business records.

Fed.R.Evid. 801(d)(2)(E) provides:

(d) **Statements which are not hearsay.** A statement is not hearsay if—

.　　.　　.　　.　　.

(2) **Admission by party-opponent.** The statement is offered against a party and is

.　　.　　.　　.　　.

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Defendant attacks the admission of the statements on procedural and substantive grounds. Our analysis melds the objections together. We start with the procedural objection. In *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977), we held that Fed. R.Evid. 104(a) requires, in a conspiracy case, that questions of admissibility be determined solely by the judge. We further held that the civil standard of preponderance of the evidence should be the test for admissibility:

[I]f it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible.

*Petrozziello*, 548 F.2d at 23. In *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 *and cert. denied*, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980), we established a "timing" rule to be followed in determining the admissibility of out-of-court statements.

If·the prosecution attempts to introduce into evidence an out-of-court declaration under Fed.R.Evid. 801(d)(2)(E), the trial court, upon proper objection, may conditionally admit the declaration. If the declaration is conditionally admitted, the court should inform the parties on the record out of the hearing of the jury that (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of ·the conspiracy, (b) that at the close of all the evidence the court will make a final *Petrozziello* determination for the record, out of the hearing of the jury. . . .

*Ciampaglia,* 628 F.2d at 638 (footnote omitted).

When defendant objected to the evidentiary offer of the statements, the trial court invoked a bench conference and stated in pertinent part:

I am satisfied, based on the evidence that has been presented thus far, that it is more likely than not, which is the standard under *Petrozziello,* that the declarant and the defendant were members of the conspiracy when these statements were made and that the statements were made in furtherance of that conspiracy and that it is admissible.

I will, in accordance with the circuit court's instructions in *Petrozziello,* at the conclusion of the government's case, which I assume is very soon, make a final determination if something happens during cross-examination or something that would change the court's conclusion.

So that this ruling is conditional in that sense and I'll make a final determination at the end of the government's case, which I understand is the procedure set up by the First Circuit to handle these kinds of issues. Okay?

Neither party advised the court that its final determination should be made at the close of *all* the evidence, not at the end of the gov-

ernment's case. The court made its final determination at the end of the government's case, and admitted the statements into evidence. Defendant did not object.

■ Defendant contends that the court's procedure violated the *Ciampaglia* rule, and for that reason argues that there must be a new trial. We agree that the court did not follow *Ciampaglia,* but conclude that a new trial is not warranted. We find that, because the defendant failed to object when the court first informed counsel how it intended to proceed and failed to object again when the court made its final ruling admitting the statements, there was a waiver of the *Ciampaglia* rule.[1] In *Ciampaglia* we faced the same situation, and stated:

In the instant case, however, neither appellant nor anyone else objected ·to the timing of the district court's finding. Appellant failed to make any objection setting forth the reasoning that he now persuades us to adopt. Even in the Eighth Circuit, which held two years ago that district courts should make a final preponderance determination at the end of all the evidence, failure to object at trial to the omission of such a determination bars an appellate [sic] from raising the point on appeal in the absence of plain error. *United States v. Baykowski,* 615 F.2d 767 (8th Cir.1980).

628 F.2d at 638.

Defendant's failure to object implicates the plain-error doctrine of Fed.R.Crim.P. 52(b), which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The Supreme Court teaches: "The Rule authorizes Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations and internal quotation marks omitted). We have read the trial record and Ex. 22–A carefully and have

---

1. In fact, defense counsel did more than fail to object. When he was informed of the procedure the court proposed following, and asked if it was "Okay," he said "Fine." This was tantamount to giving the judge a go-ahead signal.

found nothing in defendant's case that would have required or even suggested the exclusion of the statements. At the time the court made its conditional ruling there was a solid evidentiary foundation for it, which was not eroded by the testimony presented during defendant's case. We hold that the statements were properly admitted under Fed. R.Evid. 801(d)(2)(E). Consequently, we need not consider their admissibility under the Business Record exception to the Hearsay Rule.

## Sufficiency of the Evidence

We have stated the standard of review for assessing the sufficiency of the evidence after a verdict of guilty innumerable times. We cannot improve on our latest statement:

> Following a guilty verdict, a reviewing court must scrutinize the record, eschewing credibility judgments and drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found the government proved each element of the crime beyond a reasonable doubt. To sustain a conviction, the court need not conclude that only a guilty verdict appropriately could be reached; it is enough that the finding of guilt draws its essence from a plausible reading of the record.

*United States v. Sepulveda,* 15 F.3d 1161, 1173 (1st Cir.1993) (citations omitted); *see also United States v. Echeverri,* 982 F.2d 675, 677 (1st Cir.1993).

■ The question is whether there was sufficient evidence for a rational jury to find beyond a reasonable doubt that defendant conspired with Chip Bond, a/k/a John MacLean, to transport, possess, and sell stolen property in interstate commerce. We find that there was.

■ We have stated what the government has to prove in order to obtain a conviction on a conspiracy charge as follows:

> The essential elements of a conspiracy are that it was willfully formed, that the accused willfully became a member of the conspiracy, that the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, and that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

*United States v. Latham,* 874 F.2d 852, 863 (1st Cir.1989). *See also United States v. Barker Steel Co.,* 985 F.2d 1123, 1127–28 (1st Cir.1993); *United States v. Hurley,* 957 F.2d 1, 4 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1993). And a conspiracy may be proved by either direct or circumstantial evidence. *United States v. Jadusingh,* 12 F.3d 1162, 1168 (1st Cir.1994). The government fully met its burden of proof.

There is no point in rehearsing the evidence. Defendant does not dispute the evidence. His sole defense was that he neither intended to conspire, nor did in fact enter into a conspiracy with Bond to transport, possess, and sell stolen property in interstate commerce. Suffice it to say that the jury believed otherwise, and there was more than sufficient evidence for a reasonable jury to find as it did.

## The Willful Blindness Instruction

■ Defendant contends that there was not sufficient evidence to ground a willful blindness instruction. He asserts, in the alternative, that even if there were grounds for such a charge, the instruction actually used was flawed. According to defendant, the trial judge should have included the caveat that even if defendant deliberately avoided knowledge, he could not be convicted if he subjectively believed that he was not contributing to criminal activity. Defendant's Brief at 19.

■ At the outset of our discussion, we note once again that our analysis must be made within the framework of the plain error doctrine. *See supra* at 669–70. Defendant points out that in a chambers conference prior to the charge, he objected to the court's proposed willful blindness instruction. But this was only the first step. It is an ironclad rule in this circuit that "failure to renew objections after the charge constitutes waiver of any claim of error." *United States v.*

*Mendoza–Acevedo,* 950 F.2d 1, 4 (1st Cir. 1991). *See also Wartski v. Bedford,* 926 F.2d 11, 22 (1st Cir.1991). No objection to the willful blindness instruction was made after the charge. This means that we review only for plain error. *United States v. McMahon,* 938 F.2d 1501, 1510 (1st Cir.1991).

The willful blindness instruction was as follows:

> The element of knowledge may be satisfied by inferences drawn from proof that the defendant deliberately closed his eyes to what otherwise would have been obvious to him if you so find. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment about whether the jewelry was stolen would permit an inference of knowledge. Or stated in another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of that fact.
>
> It is entirely up to you as to whether you find any deliberate closing of the eyes and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

*United States v. Littlefield,* 840 F.2d 143, 147 (1st Cir.), *cert. denied,* 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988), states the rule in this circuit on a willful blindness instruction:

> It is now established in this circuit that a willful blindness instruction is proper if a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge.

In *United States v. St. Michael's Credit Union,* 880 F.2d 579, 585 (1st Cir.1989), we pointed out:

> "The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps." *[S]ee United States v. Zimmerman,* 832 F.2d 454, 458 (8th Cir.1987) (willful blindness instruction "allows the jury to impute knowledge to [a defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment.").

(Citation omitted.)

We now turn to a review of the evidence to determine whether giving a willful blindness instruction amounted to plain error. The first flag that should have aroused concern about the source of the jewelry was the manner in which Bond shipped it to defendant. For about eighteen months packages of jewelry were sent uninsured to defendant via Federal Express. None of the packages gave Bond's name as the sender. Quite the contrary: the information on the packages stated false names and addresses for the sender. Telephone numbers were not given; the word "unlisted" was used for phone information. No bills or invoices accompanied the weekly jewelry shipments. Instead, Bond enclosed typed instructions with most shipments, Ex. 22–A, as to the sale of the jewelry. If a sale price was not suggested, defendant was told to "see what you can get."

The second flag that should have raised defendant's suspicion was the telephone communication system that Bond imposed on defendant. Defendant could only contact Bond by calling Bond's beeper number. Bond's method of telephoning defendant was by collect calls to defendant from pay phones.

The third flag of suspicion was the way Bond insisted on being paid. Payment had to be made by overnight mail on the day the jewelry arrived. At first Bond asked for payments in cash. When it became obvious that cash payments entailed the risk of loss or theft or claims by Bond that payments had not been made, postal money orders were used. Bond warned defendant during the time of cash payments not to stack $100 bills on top of one another because this would give the feel of money. When money orders became the mode of payment, Bond warned defendant that weekly purchases of large money orders were "unusual" and defendant should be careful about arousing suspicions by the IRS. Bond explicitly left it up to defendant to avoid problems in Maine.

These three flags were sufficient for a willful blindness instruction, but the most

significant blinders that defendant wore were woven from his unquestioning acceptance of hundreds of thousands of dollars worth of jewelry from someone he did not know on the representation that it came from an estate. Defendant, according to his own testimony, met Bond first on August 23, 1989, and spent under a half hour with him. Bond had some chains and rings for sale. Defendant only bought part of the lot, because some of the pieces were overpriced. At Bond's request defendant paid for the jewelry with a check made out to cash. Bond came back within a few days and defendant bought a pair of unusual $5 gold coin cuff links from him. About a month later, in late September of 1989, Bond called defendant and asked if he remembered him. Defendant testified "I had no idea who he was." He only remembered Bond, when Bond reminded him of the $5 gold coin cuff links. Bond, according to defendant,

> wanted to know if I would liquidate some estate jewelry for him and that, since I was a dealer from the area that he grew up, he would allow me to do it as long as I was going to pay good prices for it and that was about it.

Shortly thereafter the packages of jewelry started to arrive.

At no time prior to March 19, 1991, when Bond telephoned defendant, and advised him that "they" were under FBI surveillance and accused defendant of being an informant, did defendant, according to his testimony, have any suspicions about the source of the jewelry or who his supplier was. Only once did defendant check on an item, a watch, that had been sent to him. And that was at the suggestion of one of his customers, Paul Zebiak. Defendant told Zebiak that there was no police record of the watch having been stolen. The jury could well have concluded that defendant was so blinded by the steady flow of jewelry that he chose not to question either its source or the bona fides of the sender.

We find that there was an ample evidentiary basis for a willful blindness instruction. Nor can any fault be found with the wording of the instruction; it fully comported with this circuit's requirements.

We further find that the court did not err in refusing to instruct the jury that even if defendant deliberately closed his eyes to the facts, he could not be convicted if he subjectively believed that he was not contributing to criminal activity. To begin with, there was no objection *after* the charge to the court's refusal to give the instruction. The plain error doctrine thus applies. *United States v. Martin,* 815 F.2d 818, 824 (1st Cir.), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987). Secondly, the court's instructions on intent made it clear that actual intent by the defendant had to be proven by the government. The court, *inter alia,* charged as follows:

> Two types of intent must be proved beyond a reasonable doubt before an individual can be said to be a member of a conspiracy: An intent to agree and an intent that the substantive crime be committed. In order for you to find the defendant guilty of the conspiracy offense, you must find beyond a reasonable doubt that he had an actual intent, whether reasonable or not, that one of the alleged crimes be committed.

We conclude that the willful blindness instruction was appropriate.

### The Sentencing

The pertinent sentencing findings of the district court were as follows:

#### Base Offense Level

I find the following:

(a) Under United States Sentencing Commission Guideline (hereinafter "Guideline") 3D1.2(b), the base offense level is 4 for receiving, transporting or possessing stolen property.

(b) Pursuant to Guideline 2B1.1(b)(1)(K), if the value of the stolen property was at least $200,000, but not more than $350,000, there is a ten-level increase. In the instant offense, $280,000 of stolen property is involved. Therefore, the base offense level is increased 10 levels to 14.

(c) Section 2B1.2(b)(4)(A) of the Guidelines further provides that if the offense was committed by a person in the business of

receiving and selling stolen property, increase by four levels. As this offense involved the defendant receiving stolen property and selling it to wholesalers, a four-level increase is merited, increasing the base offense level to 18.

(d) The defendant has not accepted responsibility for the offense. He is, therefore, not eligible to have the base offense level decreased two levels under Guideline 3E1.1(a). Therefore, the Total Offense Level is 18.

(e) The defendant's Criminal History Category is Category I.

Based on a Total Offense Level of 18 and a Criminal History Category of I, the applicable Guideline range is 27 to 33 months.

The sentencing judgment was that defendant be incarcerated for a term of twenty-nine months; that he pay a fine of $6,000; that he pay restitution of $2,500; and that he serve a term of supervised release of three years.

■ Defendant makes two objections to the sentence. First, he argues that the evidence does not support a finding that $280,-000 worth of stolen property was involved and, therefore, the ten-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(K) was invalid. Second, defendant attacks the application of § 2B1.2(b)(4)(A), on the ground that there was no evidentiary support for the finding that he was in the business of receiving and selling stolen property and, therefore, the four-level increase was invalid.[2]

There can be no question about the applicable standard of review:

Appellate review of a district court's application of the sentencing guidelines is ordinarily a dichotomous process. First, the court of appeals determines *de novo* the reach of the relevant guideline to ascertain whether it applies in a given case. Once the court of appeals has defined the guideline's meaning and scope, it reviews

the sentencing court's factfinding only for clear error.

*United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992) (citations omitted).

Because both attacks on the sentence are based on a claim of lack of evidentiary support and do not question the reach of the relevant guidelines, our review is limited to whether the district court's factual findings were clearly erroneous.

### Valuation

We start with the Commentary to § 2B1.1. Note 3 of the Commentary states in pertinent part: "3. For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."

To successfully challenge the district's factual finding of the amount of the loss, a defendant

must carry the burden of satisfying us that the court's evaluation of the loss was not only inexact, but was outside the universe of acceptable computations. *See* U.S.S.G. § 2F1.1, comment. (n. 8) (the sentencing court "need only make a reasonable estimate of the range of loss, given the available information").

*United States v. Tardiff,* 969 F.2d 1283, 1288 (1st Cir.1992).

As we read the pre-sentence report and the record of the sentencing hearing, the district court based its valuation on the following considerations. First, it considered the total amount of jewelry that passed from Bond to defendant during the eighteen months of the conspiracy. Second, it took into account several inventory valuation figures. Documentary evidence showed that defendant paid Bond at least $179,000 for the jewelry. Defendant himself estimated that he paid Bond between $150,000 to $200,000 for the jewelry. The sales to the three main purchasers of the jewelry, Spector, Zeliak and Levy, totalled $392,878.00. This figure

---

**2.** Section 2B1.2(b)(4)(A) was deleted by consolidation with § 2B1.1 effective November 1, 1993. Section 2B1.1(b)(5)(B), which is identical to § 2B1.2(b)(4)(A), provides:

If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 4 levels.

was supported by computer and invoice records. The valuation amount of $288,853.84 was the most conservative estimate in the pre-sentence report. The probation officer, after carefully reviewing the receipts and inventory records, subtracted from the total sales of $392,878.00 all sales which arguably could have been for non-jewelry items. This resulted in the valuation amount of $288,-853.84 adopted by the court.

This finding was neither clearly erroneous nor "outside the universe of acceptable computations." *Tardiff,* 969 F.2d at 1288.

### Was Defendant a Person in the Business of Receiving and Selling Stolen Property?

We have recently spoken directly to the application of § 2B1.1(b)(5)(B) (formerly § 2B1.1(b)(1)(K)). In *United States v. St. Cyr,* 977 F.2d 698, the district court applied the four-level increase "because it 'infer[red] that from [St. Cyr's] willingness and [the] easy manner in which he came into participation in this [affair] ... he was a person predisposed in buying and selling stolen property.'" *Id.* at 701. In discussing the applicability of the four-level increase we first noted that under § 2B1.2 there was a commentary by the Sentencing Commission that when persons receive stolen property for resale, "'the amount of property is likely to under-represent the scope of their criminality and the extent to which they encourage or facilitate other crimes.' § 2B1.2, comment. (backg'd)." *Id.* at 702. The government urged that the commentary was as far as we need go to decide the issue. Fortunately, and perhaps presciently, we did not rest our decision on the commentary and pointed out that it was inadequate and "prove[d] too much." *Id.* Section 2B1.2 was deleted by consolidation with § 2B1.1, effective November 1, 1993. There is no such commentary to the present § 2B1.1. The commentary was, of course, in effect at the time of defendant's sentencing, but it does not play a significant role in our analysis.

After discussing the commentary, we surveyed other appellate decisions addressing the applicability of the increase for "a person in the business of receiving and selling stolen property." We concluded that,

there is no bright line that separates defendants who are "in the business" of dealing in stolen property from those who are not so engaged. Therefore, in mulling whether to impose the ITB enhancement, the sentencing judge must undertake a case-by-case approach, weighing the totality of the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation, in order to determine whether a defendant is "in the business" of receiving and selling stolen property.

*Id.* at 703.

We listed and explained a number of circumstances for the district court to factor into its applicability assessment. The most important was the regularity of defendant's dealings in stolen merchandise. In considering this factor we suggested that,

a sentencing court can certainly consider evidence about the amount of income generated through fencing activities, the defendant's past activities, his demonstrated interest in continuing or expanding the operation, and the value of the property handled. Where there is no indication either of a pattern of dealing in stolen property or of a developed operation that promises such consistency for the future, the defendant is unlikely to be "in the business."

*Id.*

A second circumstance to be considered is the sophistication of defendant's operation. We observed:

We agree that the sophistication of the defendant's operation is a second circumstance that may itself indicate business conduct. We can easily imagine situations in which a fencing business, although very much a business, has been recently launched and therefore traces no historical pattern. In order to distinguish a new-to-the-business fence from an amateur, however, the government must at least offer a meaningful proxy for regularity, say, by showing that the operation crossed a

threshold of sophistication and commitment.

*Id.* at 704.

The *St. Cyr* court found that there was no evidence from which either regularity or sophistication could be found and held that four-level increase was inapplicable. In the case at bar we come to the opposite conclusion.

■ The question is whether the district court was clearly erroneous in finding that defendant was "a person in the business of receiving and selling stolen property." The evidence, viewed in the light most favorable to the government, clearly demonstrates that defendant was a fence. Defendant bought stolen jewelry from Bond on a weekly basis for an eighteen month period. The amount defendant paid for the jewelry was much less than its market value. He sold the jewelry as soon as he could after he received it. He used the normal channels of his coin shop business to make these sales, and he kept records of these transactions.

There can be little doubt that the sale of the stolen jewelry was vital to defendant's business. Defendant testified that he lost $2,000 during his first year in business. After Bond started supplying him with stolen jewelry, defendant's business tripled. And the business closed down three months after the flow of jewelry stopped in March of 1991.

The sales end of defendant's receiving and selling stolen goods proceeded with all the accouterments of a business. Although we would not call the business arrangements between defendant and Bond "sophisticated" in the dictionary sense, they were a *modus operandi* designed to minimize suspicion and to keep both supplier and receiver financially satisfied. Until the police blew the whistle, defendant ran a successful fencing operation.

The judgment of the district court is *Affirmed.*