USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1592 UNITED STATES OF AMERICA, Appellee, v. ROBERT MCMINN, Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Joseph A. DiClerico, Jr., U.S. District Judge] ___________________  ____________________ Before Torruella, Chief Judge, ___________ Cyr* and Boudin, Circuit Judges. ______________  ____________________ Matthew J. Lahey, with whom McLaughlin, Hemeon & Lahey, P.A. was ________________ ________________________________ on brief for appellant. Jean B. Weld, Assistant United States Attorney, with whom Paul M. ____________ _______ Gagnon, United States Attorney, was on brief for appellee. ______  ____________________ January 13, 1997  ____________________   ____________________ *Cyr, J., was not present at oral argument.  CYR, Circuit Judge. Appellant Robert McMinn mounts CYR, Circuit Judge.  _____________ four challenges to the sentence imposed following his conviction on several felony counts relating to his acquisition, interstate transportation, and sale of stolen audio and video components. See 18 U.S.C. 371, 2314 & 2315. As the sentence enhancement ___ imposed pursuant to U.S.S.G. 2B1.1(b)(4)(B) for engaging "in the business of receiving and selling stolen property" ("ITB" enhancement) constituted error, we vacate the district court judgment and remand for resentencing.  I I DISCUSSION DISCUSSION __________ A. Upward Departure (U.S.S.G. 4A1.3) A. Upward Departure (U.S.S.G. 4A1.3) __________________________________ The district court granted the government's motion for an upward departure under U.S.S.G. 4A1.3 (1995), from a Total Offense Level ("TOL") of 18 and a Criminal History Category ("CHC") of III, to TOL 20 and CHC VI, on the ground that CHC III would have underrepresented the seriousness of McMinn's prior criminal conduct and the likelihood of recidivism. McMinn contends that the three affidavits relied upon by the district court for its departure-related findings were not reliable.1  First, the district court did not place principal reliance on the challenged affidavits for its factual findings  ____________________ 1We review factual findings for clear error, see United ___ ______ States v. Shrader, 56 F.3d 288, 292 (1st Cir. 1995), mindful that ______ _______ the sentencing court is vested with "wide discretion" to deter- mine whether sentencing information is reliable. Id. at 294.  ___ 2 relating to the seriousness of McMinn's prior criminal conduct.2 Moreover, though McMinn claims that the affidavits were uncorrob- orated, and the affiants untrustworthy, he chose not to cross- examine one of the affiants at sentencing. In addition, he had cross-examined the other two affiants at the earlier trial on drug-conspiracy charges before the same judge. See supra note 1. ___ _____ Finally, the district court was presented with unchallenged ____________ police reports, describing various burglaries and corroborating other information in the affidavits. See United States v. ___ ______________ Shrader, 56 F.3d 288, 294 (1st Cir. 1995). There was no clear _______ error. B. Obstruction of Justice Enhancement (U.S.S.G. 3C1.1) B. Obstruction of Justice Enhancement (U.S.S.G. 3C1.1) ____________________________________________________ Second, McMinn challenges a two-level enhancement for obstruction of justice, see U.S.S.G. 3C1.1, based on threaten- ___ ing letters he sent in February, April and October of 1995 to Steven Serfass, a prospective government witness. McMinn argues that Serfass was not connected with the investigation, prosecu- tion, or sentencing of the "instant" offenses involving inter- state transportation, receipt, and sale of stolen audio and video  ____________________ 2Rather, the upward departure decision was based upon the following considerations as well: (1) five felony drug convictions entered June 13, 1989, and six convictions based on criminal conduct occurring between 1990 and 1994, which were not taken into account in calculating the CHC; (2) an uncharged burglary; (3) an uncharged conspiracy to distribute large quantities of marijuana between 1987 and 1995; and, finally,  (4) the fact that McMinn was on bail when he committed the stolen-property offense, and had also violated parole and commit- ted various other infractions, including drug use, while incar- cerated. 3 components, since Serfass neither testified, nor were the threat- ening letters admitted, at the trial on these charges. Instead, Serfass testified at an earlier trial on drug charges which were severed from the stolen-property charges on June 20, 1995. As the enhancement for obstruction of justice under U.S.S.G. 3C1.1 applies only to obstructing an "investigation, prosecution, or sentencing of the instant offense," McMinn claims that the _______ district court erred as a matter of law in concluding that conduct unconnected with the stolen-property charges could support the enhancement. We find no error.  At the time McMinn mailed the threatening letters, Serfass remained a prospective government witness in relation to the "instant offense"; i.e., the stolen-property charges. It was ____ not until January 1996, immediately prior to the trial on the stolen-property charges, that it became clear that Serfass would not testify. Thus, there was no error in the district court's determination that McMinn attempted to obstruct the prosecution of the stolen-property charges by mailing the threatening let- ters. C. ITB Enhancement (U.S.S.G. 2B1.1(b)(4)(B)(1995)) C. ITB Enhancement (U.S.S.G. 2B1.1(b)(4)(B)(1995)) ________________________________________________ Third, McMinn contends that the district court erred in imposing a four-level ITB enhancement under U.S.S.G.  2B1.1(b)(4)(B) (1995). Relying primarily on United States v. ______________ Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990), he argues that an __________ ITB enhancement is impermissible unless the defendant was in the business of receiving and selling property stolen by others _________ ___ ______ (i.e., in the business of "fencing" stolen property). The ____ 4 district court ruling that McMinn's criminal conduct came within the ITB enhancement guideline is reviewed de novo. See United __ ____ ___ ______ States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992).  ______ _______ The four-level ITB enhancement guideline, by its express terms, applies only if "the offense involved receiving stolen property, and the defendant was a person in the business __ ___ ________ of receiving and selling stolen property." U.S.S.G.  __ _________ ___ 2B1.1(b)(4)(B) (emphasis added). Thus, on its face at least, the ITB guideline does not apply to a defendant who makes a business of stealing property; that is, a professional "thief," as distin- guished from a professional fence. See Braslawsky, 913 F.2d at ___ __________ 468 (holding that, by its terms, the ITB enhancement does not apply to a professional thief).  Under the common-law tradition, stealing property from another normally does not equate with "receiving" property from its rightful owner. See Milanovich v. United States, 365 U.S. ___ __________ ______________ 551, 558 (1961) (Frankfurter, J., dissenting) ("a thief cannot be charged with committing two offenses that is, stealing and receiving the goods he has stolen[,] . . . for the commonsensical, if not obvious, reason that a man who takes property does not at the same time give himself the property he has taken.") (citations omitted); Baugh v. United States, 540 _____ ______________ F.2d 1245, 1246 (4th Cir. 1976) ("logic . . . instructs us that there is an inherent inconsistency in treating a taking as a receipt"); see also United States v. Trzcinski, 553 F.2d 851, 853 ___ ____ _____________ _________ (3d Cir. 1976), cert. denied, 431 U.S. 919 (1977). Therefore, ____ ______ 5 statutes which criminalize "receiving" are generally not thought to target the thief himself, but the wrongdoer who knowingly acquires the loot from or through the thief. See, e.g., ___ ____ Milanovich, 365 U.S. at 729-730; Heflin v. United States, 358 __________ ______ _____________ U.S. 415, 419-20 (1959); United States v. Washington, 861 F.2d _____________ __________ 350, 352 (2d Cir. 1988). Thus, a fair reading of the plain language employed in section 2B1.1(b)(4)(B) strongly suggests that a defendant engaged in selling only the property he is responsible for stealing has not "received" it in the sense contemplated by the Sentencing Commission.  Should there be any doubt about the plain language, the parallel development of the sentencing guideline governing thefts of property, see U.S.S.G. 2B1.1, and the guideline on receiving ___ stolen property, see id. 2B1.2, together with the evolution of ___ __ the language employed in the ITB enhancement guideline itself, see id. 2B1.1(b)(4)(B), tend to confirm that the Commission ___ __ envisioned that "theft" alone not constitute a "receiving" of stolen property for these purposes. Under the original Sentenc- ing Guidelines, U.S.S.G. 2B1.1 (1987) governed "Larceny, Embezzlement and Other Forms of Theft," whereas U.S.S.G. 2B1.2 (1987) governed "Receiving Stolen Property." The offense of receiving stolen property was subject to an ITB enhancement, see ___ U.S.S.G. 2B1.2(b)(2)(A) (1987) ("If the offense [i.e. receiving ___ _______ ____ stolen property] was committed by a person in the business of __ ___ ________ __ selling stolen property, increase by 4 levels.") (emphasis _______ ______ ________ added), which clearly applied to the professional fence and not 6 to a defendant who simply sold property he pilfered. See id.  ___ __ 2B1.2, comment (backg'd) (1987) ("Persons who receive stolen _______ property for resale receive a sentence enhancement . . . .") ______ (emphasis added);3 Braslawsky, 913 F.2d at 468. The guideline __________ governing theft crimes included no corresponding ITB enhancement. See U.S.S.G. 2B1.1 (1987). ___ The disjunctive treatment required under these two guideline sections clearly implied that the Commission did not intend that the ITB enhancement apply to defendants responsible only for the theft of the ill-gotten property and not its "re- sale." See supra note 3. At the time the Sentencing Guidelines ___ _____ were promulgated, the Commission consistently demonstrated its intention that like enhancements be applicable to both "theft" and "receipt" offenses by including a parallel enhancement  ____________________ 3The Commission's choice of the word "resale" vividly suggests a prior sale (by the thief to the fence) conspicuously lacking between the rightful owner and the thief. Thus, the commentary provides authoritative definition to the scope of the original ITB enhancement. See Stinson v. United States, 508 U.S. ___ _______ _____________ 36, 38 (1993) (" . . . commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsis- tent with, or a plainly erroneous reading of, that guideline."). The background commentary to U.S.S.G. 2B1.2 was deleted at the time U.S.S.G. 2B1.2 was consolidated into U.S.S.G. 2B1.1. See U.S.S.G. 2B1.1, as amended by amendment 481 (effective Nov. ___ __ _______ __ 1, 1993). But though there is no longer any commentary on the ITB enhancement, see United States v. Richardson, 14 F.3d 666, ___ _____________ __________ 674 (1st Cir. 1994), neither is there any reason to believe that consolidation of the two original guideline sections, and the consequent deletion of the background commentary, was meant to alter the scope of the ITB enhancement. Rather, along with the consolidation and deletion of 24 other guideline sections, the Commission consolidated 2B1.2 with 2B1.1 because the offenses were closely related and the Commission wanted to simplify the Guidelines Manual. See U.S.S.G. App. C, amend. 481 (1995). ___ 7 provision in each guideline. See id. 2B1.1(b)(2); 2B1.2(b)(3) ____ ___ __ (1987) (parallel enhancements relating to stealing and receiving (stolen) firearm, destructive device or controlled substance); id. 2B1.1(b)(4); 2B1.2(b)(2)(B) (1987) (parallel enhancements __ for more than minimal planning relating to stealing and receiving (stolen) property); id. 2B1.1(b)(6); 2B1.2(b)(4) (1987) __ (parallel enhancements for engaging in organized criminal activi- ty relating to stealing and receiving (stolen) property); see ___ also U.S.S.G. App. C, amend. 117 (effective Nov. 1, 1989) (adding ____ ITB enhancement to U.S.S.G. 2B6.1 trafficking in motor vehicles with altered or obliterated identification numbers  "to resolve an inconsistency between . . . section [2B6.1] and  2B1.2").  The subsequent evolution of the ITB enhancement guide- line likewise substantiates that it was meant to cover the professional fence, not the thief. As the Commission broadened the scope of U.S.S.G. 2B1.2 ("Receiving Stolen Property"), the language in the ITB enhancement itself was amended to retain its narrow focus upon defendants who "fence" stolen goods. The "Receiving Stolen Property" guideline was amended in 1989 to cover "Transporting, Transferring, Transmitting, or Possessing Stolen Property." U.S.S.G. 2B1.2, as amended by amend. 102 __ _______ __ (effective Nov. 1, 1989). Under the same amendment, the ITB enhancement guideline was changed to read, "[i]f the offense was committed by a person in the business of receiving and selling _________ ___ stolen property, increase by 4 levels." Id. 2B1.2(b)(3)(A) __ 8 (1989) (emphasis added to amendatory language). Thus, it is apparent from the context that the words "receiving and" were included so as to restrict application of the ITB enhancement to defendants who receive and sell stolen property (i.e. profession- _______ ___ al fences) and to exclude from its reach others, including the thief, who transport, transfer, transmit, or possess, and then sell, stolen property.  In 1993, the separate guideline provisions governing theft offenses and the receiving of stolen property were consoli- dated. See U.S.S.G. 2B1.1 as amended by amend. 481 (effective ___ __ _______ __ Nov. 1, 1993). The same 1993 amendment introduced the language currently found in the ITB enhancement guideline, prescribing a four-level enhancement "[i]f the offense involved receiving _________________________________ stolen property, and the defendant was a person in the business _______________ of receiving and selling stolen property." Id. 2B1.1(b)(5)(A) __ (1993) (emphasis added to amendatory language).  The historical context in which the 1993 amendment was adopted thus demonstrates that the reconstructed ITB enhancement was designed to apply only to defendants who "received" stolen property and whose offense of conviction would come within the scope of former U.S.S.G. 2B1.2 ("Receiving Stolen Property"), as opposed to defendants who pilfered the property and whose offense of conviction therefore came within the scope of the original version of U.S.S.G. 2B1.1. It seems reasonably clear, therefore, viewed in an historical perspective, that the words 9 "receiving and" were added to preserve the limited reach of the ITB enhancement. On the other hand, the interpretation propounded by the government presumes that the Commission twice amended the ITB enhancement so as to make it applicable only to defendants who "receive" stolen property, yet intended the term "receiving" to mean merely "taking possession of," thereby encompassing simple theft. Though as a literal matter, without regard to its histor- ical context, the term "receiving" does not necessarily exclude "theft," we conclude that the references to defendants who "receive and sell" stolen property were not meant to apply to a defendant who simply sells only property he has stolen. Our construction is guided by conventional interpretive principles. See United States v. DeLuca, 17 F.3d 6, 10 (1st Cir. ___ _____________ ______ 1994) (applying customary rules of statutory interpretation to sentencing guidelines). It avoids interpreting the words "re- ceiving and" out of the ITB enhancement guideline as surplusage. See United States v. Campos-Serrano, 404 U.S. 293, 301 n.14 ___ _____________ ______________ (1971) ("A statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). Whereas, were we to adopt the government's view that the language in the current ITB enhancement ("in the business of receiving and selling stolen property") reaches both the thief and the professional fence  then the language of the original ITB enhancement ("in the 10 business . . . of selling stolen property") need never have been amended in 1989.  Our interpretation comports with basic guideline sentencing policy as well. See 18 U.S.C. 3553(a)(1),(2) ___ (A),(B),(C)&(5). The services of a professional fence undoubted- ly facilitate the ready, advantageous disposition of property stolen by the less well-situated thief, thereby providing a significant inducement to commit theft offenses. See United ___ ______ States v. Sutton, 77 F.3d 91, 94 (5th Cir. 1996); Braslawsky, 913 ______ ______ __________ F.2d at 468; United States v. Bolin, 423 F.2d 834, 838 (9th ______________ _____ Cir.), cert. denied, 398 U.S. 954 (1970); Carl Klockars, The ____ ______ ___ Professional Fence 144 (1974) (discussing the adage, "if there __________________ were no receivers, there would be no thieves"). It is reasonable to assume, as a general rule, that a professional fencing opera- tion efficiently can dispose of greater quantities of stolen goods than could the individual thieves who supply the profes- sional fence, see Klockars at 69-135, thereby enabling both the ___ thieves and the fence to realize greater returns. Cf. __ Braslawsky, 913 F.2d at 468. Thus, as a rule professional fences __________ may be expected to induce more stealing.  Furthermore, the interposition of a sophisticated fencing operation between the thief and the ultimate purchaser of the stolen property may confound or obstruct the investigation and prosecution of theft offenses. Often, the stolen property itself may be the only tangible evidence connecting the thief to the crime. Since the professional fence is better positioned to 11 move stolen goods quickly into the hands of the ultimate "black market" consumer, see Klockars at 77 n.2, 106-13, the loot is ___ more likely to be dispersed before law enforcement agencies can respond. Consequently, the fence not only affords the thief a less risky and more efficient alternative for disposing of the booty, but the increased efficiency comes at the expense of effective law enforcement.4 The government argues, nonetheless, that the ITB enhancement guideline should be construed simply to require proof that McMinn's sales of stolen goods had a certain regularity or sophistication. Cf. St. Cyr, 977 F.2d at 703 (adopting a "total- __ _______ ity of the circumstances" test). For the reasons stated above, we reject the government's interpretation as less consistent with the language, history, and purpose of the ITB enhancement guide- line.5 We think it important to point out that our opinion in St. Cyr does not support the position advocated by the _______  ____________________ 4These considerations represent an especially serious hin- drance to law enforcement when the professional fence utilizes a legitimate "front," such as a pawn shop or an outlet dealing in distressed goods at sharply lower prices. See United States v. ___ ______________ Robinson, 698 F.2d 448, 453 (D.C. Cir. 1983); Klockars at 69-135. ________ The "front" may afford a superficially valid justification for the low sale prices (i.e. the goods were pawned to the "front" or ____ acquired as distressed goods) and thus serve to impede an infer- ence that the fence knew the goods were stolen.  5Nor is the caselaw in other circuits inconsistent with the requirement that the defendant must be a "fence" in order for the ITB enhancement to apply. See, e.g., Sutton, 77 F.3d at 94; ___ ____ ______ United States v. Zuniga, 66 F.3d 225, 229 (9th Cir. 1995); United _____________ ______ ______ States v. Warshawsky, 20 F.3d 204, 214-15 (6th Cir. 1994); ______ __________ United States v. King, 21 F.3d 1302, 1303 n.2 (3d Cir. 1994); _____________ ____ United States v. Esquivel, 919 F.2d 957, 959 (5th Cir. 1990); see _____________ ________ ___ also St. Cyr, 977 F.2d at 703. ____ _______ 12 government. St. Cyr neither expressed nor implied disapproval of _______ the basic proposition that the ITB enhancement guideline should apply only to "professional fences." See id. at 703 ("We think ___ ___ this assessment fits harmoniously . . . with the decisions of those few circuit courts that have addressed the meaning of [the ITB guideline]."). Rather, the St. Cyr panel observed that a _______ "professional fence" test is not particularly helpful. Id. at ___ 702-03 ("Defining the term 'professional fence' is as chancy as defining the language of the guideline itself."). Although the "totality of the circumstances" test announced in St. Cyr did ________ define the term "in the business," the court never reached the question squarely presented here; viz., whether a defendant need ___ have been in the business of "receiving and selling" stolen _________ ___ property (i.e. acting as a fence) in order for the ITB enhance- ____ ment to apply. See also United States v. Richardson, 14 F.3d ___ ____ _____________ __________ 666, 675 (1st Cir. 1994) ("evidence . . . clearly demonstrates that defendant was a fence"); cf. United States v. Tutiven, 40 __ _____________ _______ F.3d 1, 8 (1st Cir. 1994) ("As it was stipulated that Tutiven did not steal the motor vehicles . . . logic pretty much compels the conclusion that Tutiven knowingly 'received stolen property.'"), cert. denied, 115 S. Ct. 1391 (1995).  ____ ______ The government in our case points to substantial evidence that McMinn engaged not only in extensive thievery but in storing and disseminating stolen property as well. Nothing prevents a professional thief from also conducting a fencing operation of sufficient size and continuity to qualify for the 13 ITB enhancement; criminals, too, may have more than one line of business. For the reasons we have already indicated, however, a thief would not qualify for the ITB enhancement if the only goods he distributed were those which he had stolen. There is nothing in the government's analysis or in the district court's findings to indicate that McMinn sold property which he had not stolen. Of course, since reasonable inferences are always permitted, the case might be quite different if the only evidence were that McMinn had stored and sold large quanti- ties of stolen property. Here, however, the evidence revealed that McMinn had stolen a great deal of property and, as the record now stands, we have no basis to suppose that he did not steal it all. Finally, the government argues in the alternative that McMinn should be treated as a professional fence because he neither proffered evidence, nor admitted, that he had pilfered all the stolen goods he sold. Since it is the government's burden to prove that McMinn received and sold goods stolen by others, however, its argument is fundamentally flawed. See St. ___ ___ Cyr, 977 F.2d at 702 ("the government bears the burden of estab- ___ lishing that the ITB enhancement applies in a given case").6 II II CONCLUSION CONCLUSION __________  ____________________ 6As the ITB enhancement is inapplicable to McMinn, it is unnecessary to resolve the "double counting" claim; that is, whether it was appropriate to consider the same criminal conduct in determining the upward departure and the ITB enhancement. ___ 14 For the foregoing reasons, the district court judgment is vacated and the case is remanded for resentencing consistent with this opinion.  15