# United States Court of Appeals
## For the First Circuit

---

No. 99-1756

UNITED STATES OF AMERICA,

Appellee,

v.

GERALD P. COVIELLO,

Defendant, Appellant.

---

No. 99-1782

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT S. SIMONS,

Defendant, Appellant.

---

No. 99-1783

UNITED STATES OF AMERICA,

Appellee,

v.

MARC N. ROSENGARD

Defendant, Appellant.

---

No. 99-1814

UNITED STATES OF AMERICA,

Appellee,

v.

MAXINE SIMONS

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., <u>U.S. District Judge</u>]

———————————

Before

Torruella, <u>Chief Judge</u>
Lipez, <u>Circuit Judge</u>
and Schwarzer, <u>Senior District Judge</u>.*

———————————

<u>John J. Barter</u> for appellant Gerald P. Coviello.
<u>James L. Sultan</u>, with whom <u>Charles W. Rankin</u>, <u>Michelle Menken</u>, and <u>Rankin & Sultan</u> were on brief, for appellants Robert Simons and Maxine Simons.
<u>Paul M. Yee</u> for appellant Marc N. Rosengard.
<u>Ben T. Clements</u>, Assistant United States Attorney, with whom <u>Donald K. Stern</u>, United States Attorney, was on brief, for appellee.

———————————

September 7, 2000

———————————

* Of the Northern District of California, sitting by designation.

**LIPEZ, Circuit Judge**.  Crazy Bob's, a discount computer products store in Wakefield, Massachusetts, sold stolen Microsoft software.  The owners of Crazy Bob's, Robert Simons and his wife Maxine,[1] and several employees were charged with, inter alia, a conspiracy to transport stolen property in interstate commerce.  Robert and Crazy Bob's buyer, Marc Rosenberg, pled guilty and now appeal their sentences.  Maxine and Gerald Coviello (a friend of Robert's who sold some of the stolen merchandise) went to trial, and now appeal their convictions and sentences.

The central issue, common to all appellants, is whether the district court erred in calculating the "loss" caused by the crime under the United States Sentencing Guidelines. See USSG § 2B1.1(b)(1).  The appellants also assert other sentencing errors: (1) the Simonses and Rosengard argue that they were not "in the business" of receiving and selling stolen property, id. § 2B1.1(b)(4)(B); (2) Robert argues that restitution and supervised release should not be imposed because of errors in his Fed. R. Crim. P. 11 colloquy; (3) Coviello argues that he was a "minimal" or "minor" participant, USSG § 3B1.2; and (4)

_____

[1]For the sake of convenience, we will identify the Simonses by their first names, Robert and Maxine, following the convention used by their counsel.

Rosengard claims he was entitled to a greater downward departure. Maxine and Coviello raise trial errors as well, claiming that the court should have dismissed the stolen property counts because the physical discs containing the software were "virtually worthless" and that the court should not have given a "willful blindness" jury instruction. Maxine also challenges the district court's ruling that the government could impeach a witness by establishing that the witness had been represented by Maxine's trial counsel during grand jury proceedings. We reject all of these arguments and affirm the convictions and sentences.

## I. Background

During the 1990s, Robert and Maxine Simons operated a discount computer products outlet in Wakefield, Massachusetts known as Crazy Bob's. In 1994, Robert and Maxine met David LaPointe and, acting through Crazy Bob's, began purchasing computer diskettes, tapes, and CDs which had been stolen from KAO Infosystems ("KAO"), a computer disc manufacturer. LaPointe obtained the products through several KAO employees, including John Costello. Each shipment of stolen goods was either delivered by LaPointe to Crazy Bob's or picked up from Costello's shed by Marc Rosengard, a long-time employee and buyer for Crazy Bob's.

In June 1996, LaPointe obtained more than 10,000 Microsoft Windows 95 ("Windows") CD-ROMS, which were sold to Crazy Bob's for fifteen dollars each even though the wholesale value was approximately $165 per disc. Almost all of the discs were sold to Crazy Bob's without any legitimate packaging materials, such as Microsoft boxes, licenses, manuals, or certificates of authenticity. Instead, the discs were packaged on spindles of 100 discs each and shrink-wrapped in plastic. Crazy Bob's then resold the stolen Windows discs to companies in Great Britain and California. LaPointe told Crazy Bob's buyer Rosengard that he insisted on cash for the Windows discs so that there would be no "paper trail." This request was approved by Bob and Maxine Simons and more than $240,000 in cash was delivered to LaPointe over the course of several transactions, mostly by Rosengard. Maxine often structured these payments so that each check for cash would be for less than $10,000, thereby avoiding the requirement that banks file with the Treasury Department a currency transaction report of any cash transaction of $10,000 or more.

In December 1996, LaPointe met with Rosengard and Robert Simons to negotiate the sale of at least 32,000 Microsoft Office 97 Professional Edition ("Office") CD-ROMs. Robert agreed to pay LaPointe in a series of installment payments

-5-

because, as Robert explained, he would have to sell the discs slowly to avoid attracting suspicion. Maxine Simons then wrote a $116,000 check to Costello for his role in obtaining the stolen property, falsely documenting his status with the IRS so that he would appear to be a Crazy Bob's employee. Like the Windows discs, the Office discs did not contain Microsoft packaging materials and were on spindles of 100 discs apiece. As the stolen discs did not include the "key codes" necessary to access the software, Rosengard and other Crazy Bob's employees devised a formula for creating their own key codes and printed key code stickers. Between February and July 1997 Crazy Bob's sold a total of 13,962 Office discs, at prices ranging from fifty to one hundred dollars per disc, for a total of $908,108.

On March 22, 1997, Costello was arrested by the FBI. At Robert's direction, Crazy Bob's began executing documents to transfer $425,000 of stolen property proceeds from Crazy Bob's bank account through another account, which was then closed so that checks could be distributed to Bob, Maxine, and their children. When the FBI interviewed Maxine about Costello, she informed them that he was a "consultant" for the store and that LaPointe had sold back-up tapes to Crazy Bob's on one occasion.

Crazy Bob's was able to remove at least 8,000 of the Office discs before the FBI obtained a search warrant and seized the remainder. Robert then offered to sell the 8,000 discs to Jasper "Jay" Knabb, who operated a computer store in North Carolina, informing him that they were "hot" and would need to be sold out of the country and for cash. Knabb reported these conversations to Microsoft and to the FBI, and agreed to cooperate. Knabb then told Robert that he had a customer in South America who would buy the discs. After settling on a price, they agreed that defendant Gerald Coviello (a friend of Robert's) would handle the transaction and receive ten dollars per disc (which amounted to over $80,000) for his troubles. Coviello negotiated a cash payment from Knabb and set a meeting in a restaurant parking lot to deliver the discs. At that meeting, he was arrested.

Robert, Maxine, Coviello and Rosengard (along with three co-defendants not parties to this appeal) were all indicted for conspiracy to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371. Robert, Maxine, and Rosengard were charged with sixteen counts of interstate transportation of stolen property. See id. § 2314. Robert and Maxine were also charged with one count of conspiracy to launder money, in violation of 18 U.S.C. § 371, and eleven

-7-

counts of money laundering, in violation of 18 U.S.C. §
1956(a)(1)(B)(i).[2] Finally, Maxine was charged with three counts
of structuring to evade reporting requirements, in violation of
31 U.S.C. § 5324, and one count of making false statements to
federal agents, in violation of 18 U.S.C. § 1001.

Robert and Rosengard pled guilty and were sentenced to
seventy months and thirty-three months imprisonment,
respectively. Maxine and Coviello were convicted on all counts
following a jury trial, and were sentenced to thirty-three and
thirty months each.

We will first address the loss calculation issue,
raised by all appellants, and then turn to the other sentencing
and trial error issues.

## II. Loss Calculation

The Simonses, Coviello and Rosengard all argue that the
district court misapplied Section 2B1.1(b)(1) of the Sentencing
Guidelines. Section 2B1.1(b)(1) provides for enhancements to
the base offense level in cases involving the transfer of stolen
property depending on the amount of "loss." The application
notes explain that "'[l]oss' means the value of the property
taken, damaged, or destroyed" and that "[o]rdinarily, when

---

[2]The money laundering counts against Maxine were dismissed
prior to trial.

property is taken or destroyed the loss is the fair market value of the particular property at issue." USSG § 2B1.1(B)(1) (Comment n.2); see also United States v. Carrillo-Figueroa, 34 F.3d 33, 43 (1st Cir. 1994); United States v. Skrodzki, 9 F.3d 198, 203 (1st Cir. 1993). We note that "the loss need not be determined with precision" and that the court need only "make a reasonable estimate of the loss, given the available information." USSG § 2B1.1 (Comment n.3); see also United States v. Paquette, 201 F.3d 40, 44 (1st Cir. 2000).

The district court calculated the loss by considering the "valu[e] of the property at the time it [was] taken from the rightful owner." Applying this standard, the court determined that Microsoft was the owner of the property for purposes of § 2B1.1(b)(1) (despite the fact that the discs were stolen from KAO) and that the loss should be based on Microsoft's wholesale prices for these products. Relying on testimony from Microsoft and one of its large wholesale customers, the court concluded that Microsoft could have sold the 32,000 Office CD-ROMs wholesale for $486 each and that it could have sold the 10,000 Windows CD-ROMs wholesale for $165 each. Thus the loss caused by the Simonses and Rosengard through the sale of all of these discs was $17 million, resulting in the seventeen-level enhancement that applies to loss between $10 and $20 million.

See § 2B1.1(B)(1)(R). The court found Coviello responsible only for the 8,000 Office discs he attempted to sell, resulting in a loss figure of $3.9 million and a sentencing enhancement of 15 levels. See § 2B1.1(B)(1)(P) (15 level enhancement for loss between $2.5 and $5 million).

The appellants' challenges to the loss calculation fall into three basic categories. First, they claim that the district court erred in identifying Microsoft (rather than KAO) as the victim, resulting in a higher loss figure. Second, accepting the "fair market value" approach to loss calculation used by the district court, the appellants make several related arguments that the discs had a lower market value than the district court identified. Third, the appellants suggest that some method other than the "fair market value" approach should have been employed.

We analyze each of these claims in turn, keeping in mind that the defendants bear a "heavy burden of demonstrating that the district court finding is clearly erroneous," and that loss does not have to be determined with precision. Skrodzki, 9 F.3d at 203; see also United States v. Tardiff, 969 F.2d 1238, 1283 (1st Cir. 1992) (district court's finding reversed only if "outside the universe of acceptable computations"). As the Simonses and Rosengard received the seventeen-point enhancement

-10-

applicable to losses between $10 and $20 million, they can only prevail on appeal if they demonstrate that the loss was clearly less than $10 million rather than the $17 million the district court identified. Similarly, as Coviello received the fifteen point enhancement for losses falling within the $2.5 to $5 million range, he can only prevail by showing that the loss was below $2.5 million rather than the $3.9 million the district court found.

## A. Identifying the Victim

The appellants claim that because the CD-ROMs were stolen from the custody of KAO, and because KAO was required to indemnify Microsoft for lost discs, the "victim" in this case was KAO, and the district court should have considered the loss caused to it, not to Microsoft. There is much at stake in this argument. Although Microsoft sold Windows for $165 and Office for $486, the fair market value of the discs to KAO would be no more than the $7 they charged Microsoft for the duplication services. Indeed, the appellants even argue that the discs were "overages" and destined for destruction, having no market value to KAO whatsoever. They also note that KAO could replace the discs for thirty-six cents per unit.

-11-

The argument that KAO should have been treated as the victim is flawed in several ways. First, there was sufficient evidence for the district court to conclude that Microsoft had a more significant ownership interest in the CD-ROMs. Kristi Bankhead, a product ID specialist at Microsoft, testified that although KAO was under contract to manufacture and package the discs, Microsoft retained ownership rights in the software. The Facility Agreement between KAO and Microsoft provides additional support, as it states that the entire inventory of discs is held by KAO "exclusively for distribution to Customers as authorized by Microsoft and for no other purpose, use or disposition, except as may be directed in writing by Microsoft." While the Facility Agreement did give KAO some ownership interest in the <u>physical</u> CD-ROMs in its possession, the substantial value here was not the discs themselves, but the computer programs on those discs--intellectual property that plainly belonged to Microsoft.

Appellants attempt to defeat this finding by noting that the Agreement gave KAO some interest in the physical CD-ROMs, and that the Agreement required KAO to indemnify Microsoft for lost or damaged product, typically at the rate of Microsoft's replacement cost.[3] However, the district court is

_____

[3]Notably, the appellants simply ignore the most relevant "risk of loss provision" in the Agreement--the one that requires KAO to pay 55% of the retail price of the software (rather than

-12-

not charged with resolving a contract dispute. It is charged with assessing the value of the property so that the § 2B1.1(b)(1) determination comports with the magnitude of the theft. Whatever the arrangements between KAO and Microsoft on the duplication of thirty-six cent discs, those discs contained intellectual property, indisputably belonging to Microsoft, with a wholesale market value of $168 for Windows and $486 for Office. It was this intellectual property that Crazy Bob's was interested in buying and selling, not the KAO plastic on which it was contained. Treating KAO as the "victim" and measuring loss in terms of the value of the CD duplication services rather than the value of the intellectual property would simply be ignoring reality. See United States v. Lyons, 992 F.2d 1029, 1033 (10th Cir. 1993) ("In an age where the intangible intellectual property value of goods may vastly exceed the intrinsic worth of accompanying tangible goods, application of the letter and intent of the Sentencing Guidelines mandates that courts include intangible value when thefts of tangible objects occur.").

B. Calculation of Market Value

---

the mere replacement costs) if KAO fails to take "reasonable security precautions" or if it loses more than 25,000 copies of software.

The appellants argue that even if Microsoft owned the discs, the court erred in relying on the price of $486 per unit of Office and $165 per unit of Windows. Appellants advance several related arguments as to why the "fair market value" should be calculated on the basis of lower wholesale prices.

First, they claim that the wholesale price the district court relied upon was too high because Microsoft sometimes sold its products at lower rates. Bankhead of Microsoft stated that the standard wholesale price of Windows was $165 and that the wholesale price of Office was $486. A representative from Staples, an international office supplies store, stated that these were the prices it paid for Microsoft products during the relevant time period. While there was evidence, as the district court noted, that "Microsoft on occasion disposed of its product in channels other than the regular wholesale distribution channel," there was no evidence that the stolen discs were destined for such lower price sales. Under these circumstances, it was not clear error for the district court to reason that the full wholesale price was the appropriate figure since Microsoft "would have the option to dispose of [the property] at the higher rather than lower price." See United States v. Colletti, 984 F.2d 1339, 1345 (3d Cir. 1992) (value of stolen jewelry properly calculated based on

-14-

retail value, despite evidence that victim sold product at discount); United States v. Ellerbee, 73 F.3d 105, 109 (6th Cir. 1996) (compact discs valued at full retail price, despite fact that victim actually sold discs for less).

The appellants also argue that the discs were worth much less (or even nothing at all) because they were "blemished." In support, the appellants point out that John Costello, the KAO employee who stole the discs, testified that there was a minor silkscreen blemish on the disc artwork.[4] However, the record supports the district court's conclusion that the discs were not blemished. Bankhead testified that she had the expertise to identify flaws in the discs; based on her examination, they had no defects. LaPointe described the discs as in "perfect condition." There is no evidence that the purchasers of the discs were told of defects or ever complained of them. Although the defense had samples of the stolen discs (as did the court), they offered no expert or other witnesses on this point.

---

[4]The government also acknowledges that when the FBI searched Crazy Bob's it found some scratched Office discs that had been dumped, unwrapped, into a large box. As the evidence was clear that the discs were delivered to Crazy Bob's in shrink-wrapped spindles, it was not erroneous for the district court to conclude that any scratches were caused by Crazy Bob's.

The appellants next claim that the price should be discounted because the CD-ROMs did not contain legitimate licenses. We easily reject this claim. The lack of a license did not prevent the users from accessing the software. It simply prevented them from doing so with Microsoft's blessing. This argument, then, boils down to the claim that the loss should be discounted because the goods were "hot" and therefore could not be sold at the market price for legitimate products. Obviously, the fact that a product is sold for less because it is stolen provides no basis for lowering the loss calculation, which is based on the wholesale price in a legitimate market rather than the black market price. See e.g., United States v. Pervaz, 118 F.3d 1, 10 (1st Cir. 1997); United States v. Carrington, 96 F.3d 1, 5-6 (1st Cir. 1996).

Finally, we reject the appellants' related claim that the wholesale price of the discs should be discounted because the discs did not contain packaging materials. For the Simonses and Rosengard to prevail on this theory, they would have to show that the lack of packaging reduced the fair market value of the discs from $17 million by approximately forty percent to the less than $10 million required for a lower enhancement under the Guidelines. Coviello would have to demonstrate that the missing packaging reduced the value from $3.9 million by approximately

-16-

thirty-five percent to less than $2.5 million. The district court did not clearly err in failing to make such a dramatic reduction.

Bankhead stated that "almost all of the value in the $486 price charged by Microsoft for [Office] and the $165 price charged for Windows[] derived from the intellectual property--that is, the software code contained on the CD-ROM." Indeed, Microsoft paid KAO only seven dollars per unit for its services in performing disc duplication and adding packaging. Even assuming that the lack of packaging or any other offset (such as a blemish on the disc artwork) warranted some reduction in the market value, this would only be a minor discount that would not affect the sentences. The court supportably found that the market value of the software attributable to the Simonses and Rosengard was between $10 and $20 million and the value attributable to Coviello was between $2.5 and $5 million.

## C. Alternative Measures of Loss

The appellants suggest that "fair market value" may be an inappropriate measure of loss in this case. Coviello actually proposes that the replacement cost of the discs should be the basis for calculating loss--thirty-six cents per unit (for a total of $2,880 rather than $3.9 million). Acknowledging that this replacement cost would be inadequate, the Simonses

-17-

propose that loss should be measured by the gain for the defendants, about $1.3 million. Rosengard suggests a similar approach.

In support of departing from fair market value, the appellants point to an application note which states that "[w]here the fair market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim." USSG § 2B1.1 (Comment n.2). Courts have noted that market value is inadequate in cases where the products-- such as government documents--have no market value. See, e.g., United States v. Gottfried, 58 F.3d 648, 651 (D.C. Cir. 1995) (government documents, with no market value, considered in terms of replacement costs); United States v. Berkowitz, 927 F.2d 1376, 1390 (7th Cir. 1991) (same). Here, however, the Microsoft products had a market value and, as the above analysis indicates, one that can be calculated with sufficient precision under the Guidelines. See USSG § 2B1.1(B)(1) (Comment n.3) ("The court need only make a reasonable estimate of the loss, given the available information."). It does not matter, as appellants claim, that Crazy Bob's sales might not have displaced $17 million worth of legitimate Microsoft product. What matters is that the stolen CD-ROMs contained intellectual

property that was worth between $10 million and $20 million if they had been sold legitimately.  Appellants present no authority or persuasive argument as to why the ordinary market value approach should be abandoned here.[5]

### III. Other Alleged Sentencing Errors

A. "In the Business of Receiving and Selling Stolen Property"

The Simonses and Rosengard argue that the district court erred in finding that they, through Crazy Bob's, were "in the business of receiving and selling stolen property," so as to warrant a four-level guideline enhancement under USSG § 2B1.1(b)(4)(B).  In determining whether the "in-the-business" or "ITB" enhancement should apply, the district court must consider "the totality of the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation." United States v. Richardson, 14 F.3d 666, 674 (1st Cir. 1994); see also United States v. McMinn, 103 F.3d 216, 222 (1st Cir. 1997); United States v. St. Cyr., 977 F2.d 698, 703 (1st Cir. 1992).  While de novo review applies with respect to the "meaning and scope" of the ITB enhancement, St. Cyr, 977 F.2d at

---

[5]Coviello claims that the high loss should have served as a basis for a downward departure.  The court's discretionary refusal to depart downward is not subject to appellate review. See United States v. Harotunian, 920 F.2d 1040, 1044 (1st Cir. 1990).

701, challenges to the evidentiary support are reviewed only for clear error, see Richardson, 14 F.3d at 673.

The Simonses argue that they cannot be considered "in-the-business" of buying and selling stolen property because Crazy Bob's was a legitimate business that sold many lawful products. We disagree. There is nothing in the Guidelines, the commentary or our case law to suggest that the enhancement applies to a "fence" who sells only stolen goods, but not to a "fence" who sells stolen goods through the cover of a legitimate business. To the contrary, we have noted that the concern with those in the business of receiving and selling stolen property is "especially serious . . . when the professional fence utilizes a legitimate 'front,' such as a pawn shop or an outlet dealing in distressed goods at sharply lower prices." McMinn, 103 F.3d at 221 n.4; see also United States v. Koehler, 24 F.3d 867, 871 (6th Cir. 1994) (rejecting argument that the business enhancement was precluded by defendant's claim that he "was a legitimate businessman who, in his 24 years in the auto parts business, had engaged in only two transactions regarding stolen property").

The district court did not clearly err in determining that the Simonses, through Crazy Bob's, were in the business of receiving and selling stolen property. The "most important

[factor] . . . the regularity of defendant's dealings in stolen merchandise," Richardson, 14 F.3d at 674, was easily satisfied. Likewise, the sales "proceeded with all the accouterments of a business." Id. at 675. From late 1994 until the arrest of John Costello in March 1997, Crazy Bob's purchased, in multiple transactions, roughly 40,000 stolen Windows and Office CD-ROMs worth approximately $17 million, as well as recordable compact discs, back-up tapes, and other items stolen from KAO. These transactions involved a number of Crazy Bob's employees, and they generated some of the largest profits the business had ever seen. Finally, the Simonses conducted the fencing operation in a sophisticated fashion, see id. at 674, selling to multiple out-of-state and foreign buyers to avoid attracting suspicion and laundering the proceeds through various bank accounts.[6]

While Rosengard does not challenge the district court's finding that Crazy Bob's was in the business of receiving and selling stolen property, he claims that the enhancement cannot

------

[6]The Simonses suggest that the business enhancement is particularly inappropriate for Maxine. However, Maxine was highly involved in Crazy Bob's business of selling stolen property. She was the President, director, and sole officer of the company, and, as the 60% owner, received 60% of the profits. She was personally involved with the sale of stolen property, issuing forty-nine checks for payment to LaPointe, falsely documenting the $116,000 payroll check to Costello, approving the purchase prices for the stolen goods, structuring financial transactions to conceal the profits from stolen property, and personally receiving the stolen property from LaPointe.

apply to him as a mere employee.  The government responds that even a "delivery boy" involved in the sale of stolen property is subject to the enhancement, citing United States v. Cottman, 142 F.3d 160, 166 (3rd Cir. 1998) (rejecting argument that in the business enhancement cannot apply to "low level delivery boy" in fencing scheme).

The evidence shows that Rosengard was far more than a delivery boy.  As Crazy Bob's buyer, Rosengard was LaPointe's primary contact in virtually all of the stolen property dealings, arranging which items would be purchased, for how much, and how LaPointe was to be paid.  Moreover, Rosengard personally delivered the payments to LaPointe and personally received the stolen Microsoft software.  Rosengard was the only defendant personally involved with making sales of the stolen Office discs to some of Crazy Bob's buyers.  Rosengard's claim that "he did not sell the Windows95 or the Office 97 for his own gain or business" is belied by his admission that he received "approximately $20,000" in commissions for his role in the purchase and sale of the stolen Office discs.  Indeed, from March 6 to July 10, 1997--when most of the Office discs were stolen-- Rosengard's salary jumped from $500 per week to $2,350 per week.  The district court did not err in applying the ITB enhancement.

B. Robert Simons' Restitution and Supervised Release

Robert Simons pled guilty and received a sentence of seventy months imprisonment, three years supervised release, and restitution of $908,108. He now argues, for the first time, that because he was not warned of the possibility of restitution or supervised release in his Fed. R. Crim. P. 11 plea colloquy, we should eliminate these portions of his sentence. Under these circumstances, where there has been a failure by the defendant to raise the error in the Rule 11 colloquy before the trial court, we nevertheless will determine Rule 11 compliance for the first time on appeal. See United States v. Martinez-Martinez, 69 F.3d 1215, 1219 (1st. Cir. 1995).[7]

The government concedes that Robert did not receive these warnings. There is no question that the district court should have warned Robert of the possibilities of supervised release and restitution, as Rule 11(c)(1) explicitly requires. The omission represented a partial failure to address Rule 11's

_____

[7]The government suggests that Robert waived the right to challenge the Rule 11 errors by proposing supervised release and restitution in his sentencing memorandum, and hence cannot challenge these errors on appeal. However, we find no waiver because these recommendations at the time of sentencing did not amount to "an intentional relinquishment or abandonment" of the claim that the Rule 11 colloquy was defective. United States v. Mitchell, 85 F.3d 800, 807 (1st Cir. 1996). These recommendations are relevant, however, to the Rule 11 harmless error inquiry. See infra.

"core concern" that the defendant have "knowledge of the consequences of the guilty plea." United States v. Bierd, 217 F.3d 15, 19 (1st Cir. 2000). However, even the partial failure to address a core concern is harmless under Rule 11 if it does not affect "substantial rights." Fed. R. Crim. P. 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded.").[8] Substantial rights are not affected by a failure to fully explain the consequence of the guilty plea where the defendant had no reason to expect a lesser penalty than he ultimately received. See United States v. Raineri, 42 F.3d 36, 42 (1st Cir. 1994).

The failure to warn of supervised release was harmless because Robert "receive[d] a combined sentence of imprisonment and supervised release that was less than the maximum term of imprisonment" of which he was warned." Id. (noting that in such cases the error is ordinarily harmless). With respect to

---

[8]It is not entirely clear whether a defendant raising a Rule 11 challenge for the first time on appeal must satisfy only the harmless error test in Rule 11(h), or whether the defendant must also show "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Martinez, 69 F.3d at 1219; see also Bierd, 217 F.3d at 19 (noting two standards); Noriega-Milan, 110 F.3d 162, 166 n.4 (1st Cir. 1997) (same); United States v. Miranda-Santiago, 96 F.3d 517, 522 & n.9 (1st Cir. 1996) (same). We need not address this issue as Robert's claim fails under either standard.

-24-

restitution, we have previously held that "where a defendant who is not warned of the potential for restitution is nevertheless ordered to pay such restitution, but in an amount less than the total potential criminal fine of which he was warned, the arguable error is harmless." United States v. Gonzalez, 202 F.3d 20, 28 (1st Cir. 2000); see also Padin-Torres, 988 F.2d at 284. This principle, however, does not dispose of Robert's claim. Although he was warned of the possibility of fines, the plea colloquy did not make clear that the monetary assessment could reach $908,108.

Still, there is no indication that the missing information "led [Robert] to expect a lesser penalty than he actually received." Raineri, 42 F.3d at 42. Robert has never alleged that he was unaware that the restitution would be ordered at the time he entered his plea, let alone that he pled guilty in reliance on that belief. Moreover, the evidence indicates that Robert was aware at the time of his plea that monetary remunerations in these amounts could be required. At the arraignment, Robert was told that the maximum fines on each of the twenty-five counts against him ranged from $250,000 to $925,000. Finally, Robert affirmatively requested a restitution order at the time of his sentencing, suggesting that he had been well aware of this possibility at the time of the plea hearing.

-25-

As the Rule 11 errors were harmless, we need not consider the unusual remedy Robert seeks (vacating the challenged portions of the sentences rather than withdrawing the guilty plea).  Cf. Padin-Torres, 988 F2d at 284 (discussing this remedy).

## C. Coviello's Role In Offense Adjustment

Coviello argues that the district court should have found him to be a "minimal participant" (entitled to a four-level decrease) or "minor participant" (entitled to a two-level decrease) pursuant to  USSG § 3B1.2.  To be eligible for either "role in the offense" adjustment, the defendant must demonstrate that he was "substantially less culpable than the average participant."  United States v. Ocasio, 914 F.2d 330, 333 (1st Cir. 1990) (quoting USSG § 3B1.2 commentary, background). Coviello contends that he is entitled to at least "minor participant" status because he participated in only one transaction (the sale of 8,000 stolen Office discs) during the two-year long conspiracy.  Our review is for clear error.  See id.

For Coviello to obtain a "role in the offense," adjustment, he cannot simply show that he was a minimal or minor participant in the conspiracy overall.  He must demonstrate that he was a minimal or minor participant in the conduct that formed the basis of his sentence.  See, e.g., United States v. James,

157 F.3d 1218, 1220 (10th Cir. 1998) (where sentence "was based not on the collective amount of drugs distributed by all members of the conspiracy, but only on the amount of drugs distributed" by the defendant, no role reduction is appropriate); United States v. Atanda, 60 F.3d 196, 198 (5th Cir. 1995) ("When a sentence is based on an activity in which a defendant was actually involved, § 3B1.2 does not require a reduction in the base offense level even though the defendant's activity in a larger conspiracy may have been minor or minimal."); cf. United States v. Neal, 36 F.3d 1190, 1211 (1st Cir. 1994) (defendant "mistakenly refers to the overall conspiracy encompassing five robberies as the benchmark for arguing that he played a minimal role," rather than the offenses for which he was convicted). Coviello's offense level was not based on the broader two-year conspiracy: it was based only on the single transaction in which Coviello engaged. Coviello received a fifteen-level increase for his participation in the attempted sale of $3.9 million worth of stolen Office discs. He did not receive the full seventeen-level increase other defendants received for selling all $17 million worth of stolen property.

Given these principles, the district court properly found that Coviello's sentence was based on "his part in this aspect of the conspiracy, as to which he was a full, not a minor

participant." Coviello played a critical role in the sale of the 8,000 stolen Office discs--the largest single sale attempted by Crazy Bob's, representing twenty-five percent of the total of 32,000 stolen Office discs. Coviello made the final arrangements with the buyer; he sent sample discs; he had custody of the stolen property and he delivered the property. Coviello was also set to keep a full one-third of the proceeds for the sale, amounting to about $80,000.

D. Downward Departure for Rosengard

Rosengard received a two-level downward departure because the court found such a departure was needed "to provide a rough proportionality amongst the various sentences for all the participants so that this sentence, dictated by the guidelines, is not out of sync . . . with the other sentences, some of which have been arrived at by departures as well for other reasons." Rosengard now argues that the district court did not depart far enough because he was less culpable than other defendants who received downward departures.

We have "no jurisdiction to review the extent of a departure merely because the affected defendant is dissatisfied with the quantification of the district court's generosity." United States v. Pighetti, 898 F.2d 3, 4 (1st Cir. 1990); United States v. Fisher, 3 F.3d 456, 464 (1st Cir. 1993) (no

jurisdiction to hear claim that defendant was entitled to greater downward departure because his sentence was "excessive in light of the amount of time given to codefendant"). The government also notes that any downward departure based solely on the perceived need "to equalize sentencing outcomes for similarly situated codefendants" is unlawful. United States v. Kneeland, 148 F.3d 6, 16 (1st Cir. 1998) (collecting cases); see also United States v. Rodriguez, 162 F.3d 135, 153 (1st Cir. 1998). As the government has not cross-appealed, this issue is not before us. See United States v. Gonzalez-Vazquez, Nos. 98-2108 & 98-2109, 2000 WL 967224, at *5 (1st Cir. July 18, 2000).

## IV. Trial Errors

Maxine Simons and Coviello--the two appellants who went to trial--raise several alleged errors by the trial court.

### A. Motion for Judgment of Acquittal

The National Stolen Property Act applies, in relevant part, to "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. Maxine argues that the district court should have granted her motion for judgment of acquittal on the stolen

-29-

property counts because the property consisted solely of CD-ROM discs which were "virtually worthless," aside from the intellectual property contained on them.   Maxine relies on Dowling v. United States, 473 U.S. 207, 216 (1985), in which the Supreme Court held that 18 U.S.C. § 2314 does not apply to the theft of copyrighted material without "physical taking of the subject goods."

Maxine ignores the fact that Crazy Bob's committed high-tech piracy the old-fashioned way--by buying and selling more than 40,000 pieces of tangible stolen property.  There is no authority for Maxine's proposition that when the physical property derives most of its value from its intellectual content, the defendant cannot be prosecuted under § 2314. Indeed, Dowling itself forecloses Maxine's argument.   In discussing the law of

§ 2314, the  Supreme Court stated:

> Nor does it matter that the item owes a major portion of its value to an intangible component.   See, e.g., United States v. Seagraves, 265 F.2d 876 (CA3 1959) (geophysical maps identifying possible oil deposits); United States v. Greenwald, 479 F.2d 320 (CA 6 1973) (documents bearing secret chemical formulae) [citation].   But these cases and others prosecuted under § 2314 have always involved physical "goods, wares [or] merchandise" that have themselves been "stolen, converted or taken by fraud."

473 U.S. at 216.  See also United States v. Brown, 925 F.2d 1301, 1308 n.14 (10th Cir. 1991) ("[F]or § 2314 to apply there must be some tangible item taken, however insignificant or valueless it may be, absent the intangible component.")

B. References To Maxine's Trial Attorney

Leatha Bowdoin, an employee of Crazy Bob's, testified for the government at trial pursuant to a grant of immunity. Although she had implicated Maxine Simons in her grand jury testimony, her trial testimony presented Maxine as playing a more minimal role.  On redirect examination, the government attempted to demonstrate that Bowdoin had a motive to slant her testimony in favor of the defense.  The government asked Bowdoin whether Maxine was paying her attorney's fees, to which Bowdoin answered "Maxine or myself.  It hasn't been determined yet." The government then asked whether, at her initial grand jury appearance, she was represented by "the same or different counsel as who was representing Robert and Maxine Simons at the time."  When Bowdoin answered "I believe it was the company's lawyers," the government asked whether this meant she had been represented by Mr. Sultan, one of Maxine's trial counsel. Bowdoin responded that Sultan was indeed her lawyer during the grand jury and she admitted that Crazy Bob's had paid those fees.

Maxine objected to this line of questioning and now argues that the district court abused its discretion in admitting the evidence because it was irrelevant, <u>see</u> Fed. R. Evid. 401, and, even if relevant, unduly prejudicial, <u>see</u> Fed. R. Evid. 403. In support, she cites our recent decision in <u>United States</u> v. <u>Gaines</u>, 170 F.3d 72, 82 (1st Cir. 1999), as laying down a broad rule against such evidence. It does no such thing. In that case, Gaines was accused of supplying drugs to Franklin, a government witness. As Gaines's defense was that he barely knew Franklin and did not know he was involved in drugs, we found Franklin's testimony that Gaines had once referred him to an attorney to defend him on a drug charge "highly relevant." <u>Id.</u> However, given that the actual identity of the lawyer was not necessary to challenge Gaines' defense, we were troubled that the government had "needlessly" elicited the fact that the lawyer Franklin was referred to was the very same lawyer defending Gaines at trial. <u>Id.</u> Although we found any error harmless, we noted that this irrelevant fact "created the troubling possibility that Gaines's choice of a trial attorney could be used by the jury to draw a negative inference about Gaines's involvement with drugs." <u>Id.</u>

While <u>Gaines</u> makes clear that <u>some</u> evidence of prior representations may be irrelevant and unduly prejudicial, the

evidence of prior representation in this case was neither. Bowdoin's trial testimony minimized Maxine's role in the conspiracy and contradicted earlier statements. Thus, she opened the door for the government to attack her credibility. To show bias, it was relevant to show that Maxine might pay for Bowdoin's attorney's fees at trial; that Maxine in fact had paid these fees during the grand jury proceedings; and that Crazy Bob's lawyers had provided the prior representation. The government only brought out the fact that it was Maxine's trial counsel, Sultan, who had provided the shared prior representation when Bowdoin evaded a more general question about whether they had shared the same lawyer during grand jury proceedings. The only inference the jury might have drawn-- that Bowdoin was slanting her testimony to protect Maxine in part because she had been represented by Crazy Bob's lawyers and might have her legal fees paid by Maxine--was permissible. Contrary to Maxine's protestations, where evidence of prior representation is relevant and not unduly prejudicial, there is no per se rule barring its admission. See United States v. Frazier, 944 F.2d 820, 823-27 (11th Cir. 1991) (allowing evidence of source of defendant's attorney's fees to show, in perjury prosecution, the defendant's motive to cover up for her employer); cf. United States v. Simmons, 923 F.2d 934, 948-49

(2d Cir. 1991) (holding that when members of alleged conspiracy all used same attorney, and one member paid for attorney, the multiple representation could be used to show the association between clients provided other evidence existed of the association).

C. Willful Blindness

The sole defense offered by Coviello and Maxine Simons was that they lacked knowledge that the software was stolen. The government requested, and the district court gave, a standard "willful blindness" instruction.[9] Maxine and Coviello objected to the instruction, and they now appeal this ruling. We review the propriety of a willful blindness instruction for abuse of discretion. See United States v. Cunan, 152 F.3d 29, 39 (1st Cir. 1998).

A willful blindness instruction is appropriate "if [1] a defendant claims a lack of knowledge, [2] the facts suggest a

---

[9]The court stated:

> In addition, you may infer that a defendant had knowledge of a particular fact if you find beyond a reasonable doubt that he or she deliberately avoided information about the fact that would otherwise have been obvious . . . . [This] does not mean that a person's carelessness or mistake in failing to learn about a fact would support an inference of knowledge; it would not. There must be a deliberate effort to remain ignorant of the fact.

-34-

conscious course of deliberate ignorance, and [3] the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." United States v. Richardson, 14 F.3d 666, 671 (1st Cir. 1994).   Maxine and Coviello challenge the second element,[10] claiming that the facts did not suggest that they were deliberately avoiding knowledge that the products were stolen.   In determining whether the facts suggest the type of deliberate avoidance warranting an instruction, we must consider whether the record evidence reveals "flags" of suspicion that, uninvestigated, suggest willful blindness.  Richardson, 14 F.3d at 668, 671-672; see also Gabriele, 63 F.3d at 66-67 (looking to presence of red flags); Cunan, 152 F.3d at 39 (same).

There were sufficient "flags of suspicion" to justify the instruction.  Maxine knew that: (1) the supplier of the stolen goods, LaPointe, used a business name ("Dave's Media") that had no bank account or place of business, and that he told her he was having trouble cashing checks in the business name;

---

[10]In her reply brief, Maxine argues for the first time on appeal that the willful blindness instruction was inappropriate because she was not raising a "lack of knowledge" defense.  The well-settled rule is that arguments made for the first time in a reply brief are waived. See United States v. Brennan, 994 F.2d 918, 922 n.7 (1st Cir. 1993).  In any event, the argument is frivolous, as both Maxine's closing and her cross-examination made plain that her only defense was that she did not know the products were stolen.

(2) that LaPointe insisted upon being paid in cash as the volume of their dealings increased; (3) when LaPointe delivered goods to Maxine, he never provided invoices, receipts or other paperwork; (4) LaPointe discussed with Maxine issuing a $116,000 check to John Costello, whom Maxine falsely documented as an employee.  The jury could have also inferred that Maxine was aware, through her employee Rosengard, that the computer goods were picked up at a shed at a private home and that LaPointe told Rosengard "ask me no questions and I'll tell you no lies" on the one occasion when Rosengard asked about the source of the goods.

Similarly, there were sufficient "flags" that Coviello should have taken note of, including the fact that: (1) Knabb referred to the Office discs in code as  "Wheaties Boxes"; (2) the $245,000 payment for the discs would be made in cash, after delivering the CDs to a restaurant parking lot; (3) Coviello was to personally receive about $80,000 for simply finalizing the deal and delivering the product; (4) the Office discs did not include any legitimate licenses, manuals, or other packaging; (5) Crazy Bob's created a formula to fabricate unauthorized key codes to access the software, which Coviello provided to Knabb; and (6) the goods were unaccompanied by any documentation such as a bill of sale, invoice or receipt.

Coviello further argues that even if the "flags of suspicion" were present, the instruction was inappropriate in his case because he was prosecuted only for conspiracy, and the instruction might cause a jury to conclude that he could join a conspiracy without actually entering an agreement. This argument is unpersuasive. The district court first gave complete instructions on the conspiracy elements (emphasizing that the evidence must show "that the defendant knowingly and intentionally became a participant or member of the conspiracy"), and only then turned to the instructions on the substantive crimes, including the willful blindness instruction. It is plain that the willful blindness instruction related to whether the defendants knew that the property was stolen, not to joining the conspiracy. As such, the instruction was proper. See United States v. Hurley, 63 F.3d 1, 10 (1st Cir. 1995) (instruction proper where district court gave detailed explanation of conspiracy count and then gave willful blindness instruction "aimed at the 'knowing' requirements of the substantive counts"); United States v. Brandon, 17 F.3d 409, 453 n.75 (1st Cir. 1994) (rejecting claim that willful blindness instruction was improper in conspiracy case where the instruction "had to do with the finding that 'defendant acted

knowingly' and not with a finding that defendant willfully joined the conspiracy.")

**<u>Affirmed.</u>**