*8 OPINION OF THE COURT
Arnold F. Ciaccio, S.
In this adoption proceeding, the natural mother has signed and filed a revocation of her previously given extrajudicial consent. She now asks the court to vacate and/or nullify that consent asserting that she had been under duress at the time of the signing of the consent, and that her attorney failed to comply with the statutory requirements for the consent and its delivery to the natural mother as required in Domestic Relations Law § 115-b (4) (c). The adoptive parents filed a timely opposition to the revocation asserting that there was no duress in the execution of the consent; that the failure to comply strictly with the delivery of a consent form to the natural mother is insufficient to set it aside. They ask that the court give full effect to the consent and hold a hearing to determine the best interests of the child.
QUESTIONS PRESENTED AND THE DECISION
1. Was the extrajudicial consent taken at the hospital several hours after the child’s birth compromised by duress or coercion? The decision herein answers that it was not.
2. Should the natural mother’s extrajudicial consent be vacated where she is not given a copy of the consent at the time of execution as required by Domestic Relations Law § 115-b (4) (c)? The decision vacates the consent and orders the child be returned to the natural mother.
BACKGROUND
At the hearing, the court heard the testimony of the biological mother, the maternal grandmother with whom the biological mother resides, the attorney who prepared and witnessed the signing of the extrajudicial consent, the prospective adoptive parents, the attending resident physician and other hospital personnel, as well as various business people who testified in regard to the mother’s allegation of coercion and duress and who apparently were intended to raise issues of the biological mother’s credibility.
While there were discrepancies in the testimony, a good deal of what was heard was uncontroverted.
The biological mother was 22 years of age at the time of the birth on July 31, 1997. She was unmarried and living at home with her parents. She had become involved with a young man at work and upon learning of her pregnancy in February of *9 1997, confided in a close personal friend about the pregnancy and possible adoption. It is the mother’s testimony that she was "scared but happy about the idea of having a child”. She testified that her own mother was supportive and happy about the prospect of having a grandchild but that the biological father was not supportive and in fact told the biological mother he wanted nothing to do with the baby.
With the aid of a friend who made the actual phone calls for her, the biological mother made a contact with the adoptive parents, individuals who had advertised in local newspapers as people seeking to adopt. There is little controversy but that the natural mother and adoptive parents met in early March of 1997 at a dinner meeting and were told by the natural mother that she had selected them, "that they were nice people”, lived in the area and would make good parents. Thereafter and through to the birth there is little dispute but that there were numerous telephone conversations in both directions between the biological mother and the adoptive parents. In May 1997, following a call at the biological mother’s place of business, she became uneasy and asked the adoptive parents to not call directly and that they could glean information as they desired through the friend, who had made the initial contact.
Gregory A. Franklin, Esq., an attorney with offices in Rochester, New York, had been engaged by the adoptive parents for representation in the adoption proceeding. Attorney Franklin contacted the natural mother through a letter describing adoption procedures and advising that it was not necessary for her to have an attorney until later on in the process. Mr. Franklin wrote to the natural mother to recommend attorney Michael Kelly, as an attorney who could represent her. His letter recommended no other attorneys, but did state that she could select an attorney of her own choosing if she so desired. Mr. Kelly was contacted by the natural mother at the end of May, who made an appointment, cancelled the same and then finally spoke with him sometime in early June. At that time she mailed back a questionnaire to attorney Franklin and signed various medical authorizations in Kelly’s office. It is noted that no retainer agreement was ever entered into and that Kelly displayed the consent form to the natural mother at the June meeting. All of Kelly’s fees were paid for by the adoptive parents.
In addition to those expenses, after June, the adoptive parents paid weekly wage payments to the natural mother over and above her disability allowance. They also paid all medical bills.
*10 At the June meeting, Kelly advised his client that she did not necessarily have to read the document at this time. She would have ample time to do so and it would need to be signed after the birth. The biological mother testified that she did not read the document all the way through and when Mr. Kelly asked her if she had questions, she stated she had none. She testified that Kelly did not ask her if she had read the document. It is clear that he did not read the document to her either.
On July 31, 1997, late in the evening, the natural mother experienced initial labor pains and at approximately 10:30 in the evening went to the Strong Memorial Hospital with her own mother and another friend from work. She entered the Spindler Birthing Center on arrival at the hospital. At various times present in the room were nurses, the resident physician, the biological mother’s own mother and the friend, Jackie. At 1:00 a.m., now August 1, 1997, the adoptive parents came up to the area of the birthing center having been notified by the friend, Jackie, of the impending delivery. It appears from the testimony that the adoptive parents remained in the vicinity of the delivery room for the next two hours observing the process, holding the baby and generally being part of the event. The natural mother testified to her distress during the labor, delivery and the aftermath, her lack of sleep, discomfort, and pain medication she was given. She testified to a good deal of confusion over her decision to allow the adoption of the baby. Despite all of the discomfort and related stress, the natural mother testified to a strong desire and "pressure” to leave the hospital as soon as possible. She herself made personal contact with attorney Kelly at approximately 8:30 in the morning and an apparent arrangement was made for Kelly to meet in the hospital at 12:30 in the afternoon. The biological mother testified to fighting to get released despite her exhaustion and pain and the lack of sleep. She was told that she would have to sign a release to leave early inasmuch as the physicians thought it best that she stay an additional period of time.
Attorney Kelly arrived at the hospital at approximately 12:30 p.m. on August 1, 1997, approximately 11 hours after the birth of the baby. The meeting was held in the lobby of the hospital among the attorney, the biological mother and her own mother. As attorney Kelly arrived, the adoptive parents also appeared on the scene with video camera and were asked by Kelly to wait in the cafeteria while he talked with the biological mother. At this juncture, attorney Kelly presented *11 the biological mother with the three consent forms—customary and approved 45-day extrajudicial consent forms. The biological mother testified that she was crying and shaking at this point and that Kelly handed her the three documents, telling her that they were the same that she was shown in the attorney’s office in June. It appears that Kelly instructed her that she did not have to sign at that moment but to take them home with her if she liked. Again, the biological mother’s testimony is that she was so anxious to leave that she signed anyway, did not read the documents and gave them back to Kelly. She claims to have assumed that she had 45 days to change her mind. It needs to be noted that barely 101/2 hours had elapsed from the time of birth to the signing of the documents. There is little controversy but that the birth mother had been given various pain medications as well as having spent a sleepless night. At that point, the natural mother left the hospital with her own mother.
It is uncontroverted that although she signed triplicate copies of the extrajudicial consent, she, the birth mother, was not given a copy of the signed document although as attorney Kelly testified, he had adequate time to do so. The very next day attorney Kelly went to the natural mother’s home to obtain signatures on release forms so as to permit the adoptive parents to take the baby home from the hospital. Again, at this time Kelly did not provide the natural mother with a copy of the consent form she had signed the day previously.
There is testimony that a copy of the document was subsequently mailed to her, but the birth mother and her own mother deny having received the copy.
It appears to be uncontroverted that the natural mother never read the consent form she signed nor was it read to her and clearly uncontroverted that no copy of the signed consent was given to her “upon [its] execution”.
Upon returning home, the natural mother told her own mother she had made a mistake and that she did not want to go through with the adoption. She was urged to seek counseling to which she availed herself and within three weeks contacted Kelly for purposes of preparing a revocation of the consent. She met with Kelly thereafter, signed the revocation of the consent and was told “you understand that you do not get the child back, immediately, that there would be a best interest hearing to make that determination”. There is no controversy over the appropriateness or timeliness of the written revocation supplied to the court nor the adoptive parents’ opposition to that revocation.
*12 DURESS
To void a consent based upon duress, it is necessary to find that the natural mother was not able to exercise her free will because of the actions of people around her. (Razaras v Manufacturers Trust Co., 4 AD2d 227, affd 4 NY2d 930.) Coercion would involve actual physical force being used or threatened. Duress and coercion are difficult to prove and emotional stress is not considered duress. (Matter of E.W.C., 89 Misc 2d 64.) The courts have very narrowly construed this issue and have not found emotional distress even where there was rape and placement for adoption (Matter of Commissioner of Social Servs. [Sandra G.], 141 AD2d 821), nor parental pressure (Matter of Baby Boy L., 144 AD2d 674, appeal dismissed 74 NY2d 660). The facts relied upon here involve constant attention from the adoptive parents, a signing of a consent within hours after the birth of the child and legal representation of the birth mother by an attorney recommended and paid for by the adoptive parents. While these are of concern to the court, they do not rise to the level of duress and coercion established in the case law. (This court has sua sponte made it a point to discourage strongly the execution of extrajudicial consents [or judicial consents for that matter] within hours or days after the birth of the child as well as any appearance of collusion between the adoptive parents’ attorney and the attorney for the birth mother, not freely selected or engaged.) The facts here do not rise to the level of the legal requirements to establish duress and/or coercion of the level to set aside such consents. (Matter of Jenelle P., 220 AD2d 853 [3d Dept 1995].) W/hatever duress the biological mother felt in this instance was, to this court, self-imposed and not inflicted by the adoptive parents.
EXTRAJUDICIAL CONSENT
The parent-child relationship involves a fundamental constitutional right which cannot be waived or separated without due process. (US Const, 14th Amend, § 1; Smith v Organization of Foster Families, 431 US 816 [1977]; Santosky v Kramer, 455 US 745 [1982]; Matter of Sylvia M., 82 AD2d 217, affd 57 NY2d 637 [1982].) Termination of parental rights in an adoption setting is accomplished by a consent to private placement (Domestic Relations Law § 115-b), or by a surrender to an authorized agency (Domestic Relations Law § 112 [3]), or by a court’s determination that consent is not legally required for the adoption. (Domestic Relations Law § 111 [2]; Matter of Patricia A. W., 89 Misc 2d 368.)
*13 The adoption law must be strictly construed in accord with the statutory language and legislative purpose, since adoption is entirely statutory and in derogation of common law. (Matter of Jacob, 86 NY2d 651, 657-658; Domestic Relations Law § 115-b.) There are two forms of consent to adoption: (1) judicial consent which is a consent executed before a Family Court Judge or a Surrogate and becomes irrevocable at the time of the execution (Domestic Relations Law § 115-b [2]), and (2) extrajudicial consent which is a consent given outside of court and becomes irrevocable after 45 days unless written notice of revocation is given within the 45 days. (Domestic Relations Law § 115-b [3].) It is the validity of an extrajudicial consent that this court deals with herein.
"The state has several interests in adoption proceedings. First, as parens patriae it must protect the interests of the child and seek a decision that is accurate and just. Second, the state’s interest coincides with that of the natural parent’s interest in a 'level of certainty’ to preserve the fundamental fairness of a state-sponsored proceeding that has such profound consequences. Thus the state shares with the natural parents and the child the goal of having a process that does not entail a 'risk of erroneous deprivation.’ Third, the state has an interest in the integrity of its adoption process; having created a system for adoption, it is obligated to provide fair, constitutional procedures to implement that system.” (Note, The Constitutional Rights of Natural Parents Under New York’s Adoption Statutes, 12 NYU Rev L & Soc Change 617 [1983/1984]; see also, Dennis T. v Joseph C., 82 AD2d 125.) Notwithstanding the date of the foregoing pronouncement, much of what is set forth is generally still applicable and supported over the years by several legislative changes.
The New York adoption statute, section 115-b, originally enacted in 1972 (see, L 1972, ch 639, § 3), provides the legal framework within which adoptions can take place, balancing the rights of the child, the biological parents and the adoptive parent. (Matter of Sarah K., 66 NY2d 223, 234.) Before statutory amendments were made in 1992, hearings were held to listen to complaints from adoptive parents that their rights were not fully considered when the natural parents, after consenting to the adoption, could change their minds and at the hearing still have a primary right to have the child returned to their custody. The statute was amended placing the parties on an even plane with respect to the issue of the return of the child. Now, if the natural parents withdraw their *14 consent to adoption, they do not have a primary right to the child. Instead, at a hearing, a best interests standard is the sole criteria for a custody determination. (Matter of Sarah K., supra, at 233-235.)
By what appeared to be an intrusion in the fundamental right to parent your child, the statute had to have sufficient procedural safeguards for the natural parent. In keeping with this goal to balance all the parties’ rights, the statute was amended once again in 1994 (L 1994, ch 371, § 1) to include, ''[a] copy of such consent shall be given to such parent upon the execution thereof.” (Domestic Relations Law § 115-b [4] [c] [emphasis added].) This is consistent with a judicial consent procedure which requires the Judge to give a copy of the consent to the parent at the time of the execution.
DISCUSSION
In cases involving compliance with the statute, the courts have held that strict compliance is required and where that is not accomplished, the court will look at substantial compliance. (Matter of Benson v Jordan, 184 AD2d 1080; Matter of Baby Boy B., 163 AD2d 673; Matter of Chaya S., 90 NY2d 389.) In the case of Matter of De Filippis v Kirchner (217 AD2d 145), the Court found that the consent form did not meet the statutory requirement that it be in 18-point type. However, it held that the statute was substantially complied with because the consent was drafted by the natural mother’s attorney, it was read to her, and she testified as to her understanding its contents. Similarly, in Chaya and Baby Boy B., the Courts held for substantial compliance. In Chaya, the natural mother raised an issue of representation of counsel when she attempted to vacate her judicial consent over a year after the adoption was granted. There, an attorney was present and all the provisions of the consent were fully covered by the Judge. In Baby Boy B., the revocation was made 56 days after its execution and even though the natural mother did not read the consent nor receive a copy, her attorney had reviewed each provision with her and explained their meaning.
The case here is distinguished from others on its facts in that here the revocation was timely filed, and there is no question that the consent was never read by the natural mother nor by her attorney to her. She did not have a clear understanding of the substance of the document nor was it explained to her and, finally, no copy was given as mandated by the statute. Neither the strict compliance nor the more relaxed "substan *15 tial” compliance to the statute occurred in this case. It is uncontroverted that the natural mother plainly and simply was not given a copy of the consent upon execution. The consent is therefore not valid and upon such vacatur the petition for adoption is dismissed.
The court is aware that in Benson v Jordan (184 AD2d 1080, supra) the Fourth Department required a best interest hearing even after the consent was vitiated, based upon allegations of neglect and possible abuse which might constitute a risk to the child. That is not the case here. The court has before it a report from the guardian ad litem appointed by the court who has been active in participation and observation of the court-ordered visitation during the pendency of these proceedings. It has been an ongoing concern of this court that continuous and fairly equal visitation be accorded both parties so that whatever the outcome, the absence of one of them would not cause undue trauma from the separation. The attorney for the child reports that both home "environments were appropriate”. She found "no evidence to suggest that the child would not be well cared for in either home,” and "neither [party] raised any question of the other’s fitness as parent.” In fact, each firmly acknowledged that "the other was a good and appropriate person, who would make a good parent.” While the court, because of its decision herein, does not reach the issue of best interest, it nonetheless must be reassured that the child, if returned to the natural parent, would not be at risk. (See also, Matter of Male M., 76 AD2d 839.)
On the state of this record including the report of the guardian ad litem, the court directs the child be returned to the natural mother. The arrangements for such return shall be made within 48 hours of the decision being received by counsel.