**Mouna Kandy SUBOH, Individually, As Administratrix Of The Estate Of Ishaq Suboh, And As Next Friend Of Her Minor Daughter, Sofia Kandy, Plaintiffs,**

v.

**Carl BORGIOLI, Defendant.**

**No. CIV.A.00–10396–WGY.**

United States District Court,
D. Massachusetts.

Jan. 7, 2004.

---

194

Michael J. Akerson, Edward P. Reardon, P.C., Worcester, MA, Denise DiCarlo, City Solicitor's Office, Revere, MA, Austin M. Joyce, Edward P. Reardon, P.C., Worcester, MA, for Defendants.

Laurie A. Frankl, Rodgers, Powers & Schwartz LLP, Boston, MA, James R. Knudsen, Whittenberg Knudsen, LLP, Lynnfield, MA, Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Boston, MA, for Plaintiffs.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. SOME PRELIMINARY THOUGHTS

There is a derisive ditty going around the courthouse as this opinion is being written. Set to the music of "Happy Together" by The Turtles, in relevant part it goes:

Imagine me as God. I do.

I think about it day and night.

It feels so right

To be a federal district judge and know that I'm

Appointed forever.

I was anointed by the President,

And revelation told him I was heaven-sent.

And Congress in their wisdom granted their consent.

Appointed forever.

I'm a federal judge

And I'm smarter than you

For all my life.

I can do whatever I want to do

For all my life.

\*　　\*　　\*　　\*　　\*　　\*

Even at the very worst,

If you take me up to get reversed,

You'll have to get the circuit court to hear you first,

And that takes forever.

Bar & Grill Singers, *Appointed Forever*, *on* Licensed To Grill (1997), lyrics avail-

able at http:// volokh.blogspot.com /2003_04_13_volokh_archive.html# 2001549 16 (last visited January 6, 2003).[1]

The reality is more prosaic, yet far more enduring.

> [L]awyers who become judges ... seek to operate as if bound by rules not because they will be punished if they do not but because they believe it is the right thing for a judge to do. They begin to think about cases not from their intuition about the just outcome but from the dictates of authoritative sources of law. The question that judges ask is ... "What is the law, and what does it mean for this case?" Those may be difficult questions in themselves, but they significantly narrow the ambit of admissible considerations.

> ... [T]he orientation of judges to applying law does not do away with the problems inherent in that task. The process of interpreting legal authority and of applying it to new cases often requires highly contextual judgments respecting the nature of the principles embodied in governing law and the circumstances relevant to the application of a given principle. Legislators and constitution framers cannot foresee all relevant circumstances, nor can they specify with clarity all applications of the principles they adopt; they cannot, in other words, always fashion meaningful rules that fully give effect to the law framers' general design. Indeed, it would be wasteful to try.

Ronald A. Cass, *The Rule of Law in America* 69, 72–73 (2001) (criticizing the notion, advanced by legal scholars like Duncan Kennedy, that the question judges typically ask when confronted with a case

for decision is: "How do I describe the law to make it fit my preference respecting the outcome of this case?").

Of which genre is this case? Here, despite case-specific guidance from the court of appeals, I botched the instructions to the jury. Neither side objected and, as it turns out, the error made no difference to the jury whatsoever. I know this latter fact, however, from sources I am duty-bound not to consider. What to do?

## II. INTRODUCTION

Following an adverse verdict on their civil rights claim, the plaintiffs—Mouna Kandy Suboh ("Suboh") suing individually, as administratrix of the estate of Ishaq Suboh, and as next friend of her minor daughter Sofia Kandy ("Sofia")—have moved for judgment as matter of law, or alternatively, for a new trial on grounds that the verdict was against the weight of the evidence and that the jury instructions were erroneous. The Court held a hearing on the plaintiffs' motion on April 8, 2003. At that hearing, the Court denied the plaintiffs' motion for judgment as matter of law, but took under advisement the issue of error in the jury instructions. 4/8/03 Tr. at 2, 11. More specifically, the Court acknowledged that the jury instructions were indeed erroneous, but noted—with the acknowledgment of the plaintiffs' counsel—that no timely objection was made to those instructions. *See id.* at 2–3, 6. Thus, the question is now whether the error in the jury instructions rises to the level of plain error warranting a new trial. *Id.* at 3, 11. The Court further ruled that if it *did* conclude that a new trial was warranted, qualified immunity would not

---

**1.** A nationally syndicated columnist claims that Judge Edward Prado sang this song to a sitting jury. David S. Broder, *Unlike Estrada,* *Prado Gets an Easy Nod,* Boston Globe, Apr. 16, 2003, at A19.

protect the defendant, Carl Borgioli ("Borgioli"). *Id.* at 10–11.

Upon reflection, the Court has concluded that there was plain error in the jury instructions, and that a new trial is therefore warranted. The following discussion serves (1) to identify the nature of the error and to explain why, in this Court's view, it qualifies as plain error; and (2) to discuss the framework within which the new trial will be conducted, with particular reference to the Court's ruling that Borgioli is not entitled to qualified immunity.

## III. DISCUSSION

### A. Error in the Jury Instructions

#### 1. Identification of the Error

In assessing the error in the Court's instructions to the jury, it is helpful to begin with a brief review of the nature of Suboh's complaint and of the applicable law. The factual background of this case is discussed in great detail in *Suboh v. District Attorney's Office of the Suffolk District,* 298 F.3d 81 (1st Cir.2002). As the First Circuit explained in that opinion, Suboh's complaint most directly implicates the procedural due process rights accorded to parents under the Due Process Clause of the Fourteenth Amendment. *Suboh,* 298 F.3d at 91. Reduced to its essence, Suboh's claim is that Officer Borgioli of the Revere Police Department violated her procedural due process rights when he separated her from her biological daughter, Sofia, and placed Sofia in the custody of Suboh's parents, Mustapha and Rahima Kandy ("the Kandys"), without ensuring that Suboh would receive a pre-separation or post-separation hearing, despite Suboh's statements to him that she was Sofia's biological mother and wanted custody. *See id.* at 87–88, 91. As the *Suboh* court put it, "[w]hat is at issue here is the right of a parent to procedural due process protections before a governmental official resolves the disputed issue of custody of a child, when there are known competing claims to custody." *Id.* at 91.

The case law sets out the process that is due when a parent is being deprived of custody of her child: a pre-removal hearing, or, in emergency circumstances, a post-removal hearing instead. As the *Suboh* court stated:

> Due process protects a parent's rights even when a state temporarily removes a child before obtaining a court order, as the state may place a child in temporary custody only when it has evidence giving rise to a suspicion that the child has been abused or is in imminent danger. Moreover, due process requires that some sort of process be provided promptly after an emergency removal. [I]n those extra-ordinary situations where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed.

*Suboh,* 298 F.3d at 92 (alteration in original) (quoting *Weller v. Dept. of Social Servs.,* 901 F.2d 387, 393 (4th Cir.1990) (quoting *Hooks v. Hooks,* 771 F.2d 935, 942 (6th Cir.1985) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977)))) (internal quotation marks omitted).

Moreover, in cases where such an emergency removal occurs, courts have held that the burden is on the *government* to initiate a post-deprivation hearing to provide the parent with the process that is due, and to take the necessary steps to ensure that such a hearing will be available. *See Weller,* 901 F.2d at 395–96 ("The burden of initiating judicial review must be shouldered by the government.... Proof that defendants deprived [the plaintiff] of the custody of [his son] without a hearing—either prior to the

transfer of custody or promptly after an emergency transfer of custody—would show a due process violation, for which appropriate relief may be granted."); *Hooks,* 771 F.2d at 942 (6th Cir.1985) ("Here the children were turned over to [the defendant father] by the Tennessee defendants allegedly with the knowledge that they would immediately be taken to Texas and thus out of the jurisdiction of Tennessee, effectively eliminating the opportunity for [the plaintiff mother] to receive a post-deprivation hearing. *The Tennessee defendants do not contend that they made any effort to request or direct [the defendant father] to remain in Tennessee until a hearing could be held.*") (emphasis added); *Duchesne,* 566 F.2d at 828 ("In this situation, the state cannot constitutionally 'sit back and wait' for the parent to institute judicial proceedings. It cannot ... [adopt] for itself an attitude of 'if you don't like it, sue.' " (alteration in original) (internal citations and quotation marks omitted)).

■ In other words, the Fourteenth Amendment's Due Process Clause provides a blanket protection against the loss of parental custody without some sort of a hearing. If a parent receives no review whatsoever, her procedural due process rights have, by definition, been violated. Thus, the inquiry is different from that implicated by substantive due process cases involving, say, excessive force, where if the force is deemed to have been reasonable, no violation of the Fourth Amendment (as incorporated against the States through the Due Process Clause of the Fourteenth Amendment) has occurred. The Fourth Amendment does not protect against the use of *any* force; it protects only against the use of excessive force. *See, e.g., Gaudreault v. Municipality of Salem,* 923 F.2d 203, 205 (1st Cir.1990). By contrast, the procedural aspect of the Due Process Clause has been interpreted to provide a blanket protection against the loss of parental custody without some sort of a hearing. The question is thus not whether government can take a particular action at all, but rather whether it can do so without providing a hearing to an individual who might suffer a deprivation of liberty or property as a result.

■ At trial, the evidence was undisputed that (1) Suboh is Sofia's biological mother; (2) Suboh told Borgioli that she was Sofia's biological mother; (3) Suboh told Borgioli that she wanted custody of Sofia; (4) Borgioli decided to place Sofia in the custody of the Kandys; and (5) Borgioli did not make provisions for Suboh to have a pre-separation or post-separation hearing (and none ever occurred). *See* 2/26/03 Tr. at 20 (Borgioli's testimony that Suboh told him that she was Sofia's biological mother); 2/26/03 Tr. at 53 (Borgioli's testimony that Suboh told him that she was trying to regain custody of Sofia); 2/25/03 Tr. at 4–5 (Borgioli's testimony that he decided to release Sofia to the Kandys without referring the matter to a judge or contacting the Massachusetts Department of Social Services); 2/26/03 Tr. at 53 and 2/25/03 Tr. at 11 (Borgioli's testimony that he did not instruct or ask the Kandys to remain in the country, but merely communicated to them that they would have to return to the country to appear in court). Given those established facts, Suboh's procedural due process rights[2] were, by definition, violated.[3] In

---

**2.** Borgioli has argued, with reference to *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), that Suboh did not have any procedural due process rights to

custody of Sofia because she did not have a protected liberty interest in the custody of her daughter, given that "[n]o evidence was presented that the relationship between Mouna

Suboh and her daughter Sofia was more than mere biology and infrequent or *de minimis* contact (with all of that contact coming within a context of a purported sibling relationship)." Def.'s Opp'n at 6 n. 2 [Docket No. 179]. It is true that, if Suboh did not have a fundamental liberty interest in the care and custody of Sofia, she could not invoke procedural due process to protect that interest. Borgioli's interpretation of *Michael H.* to mean that Suboh did not have a protected liberty interest, however, is unsupportable. The First Circuit Court of Appeals apparently agrees. The *Suboh* court said: "We think it plain that Suboh alleges a violation of a constitutional right," a statement that is incompatible with Borgioli's analysis. *Suboh*, 298 F.3d at 93. Rather than rest on the authority of the First Circuit's statement, however, the Court will explain why it is correct.

In *Michael H.*, a plurality of the Supreme Court held that when a child is conceived through an adulterous relationship, the biological father does not have a procedural due process right to a hearing in which he can establish his paternity, because the Due Process Clause did not give him a liberty interest in maintaining a parental relationship with his child. (Justice Stevens's concurrence, which provided the necessary fifth vote, left open the possibility that, as the dissenters maintained, the father had a liberty interest grounded in substantive due process, but Justice Stevens determined that the State's statutory scheme complied with procedural due process. *Id.* at 133, 109 S.Ct. 2333 (Stevens, J., concurring in the judgment).) The Court explained that for the biological father to prevail, he would need to establish that our society "has traditionally accorded such a father parental rights, or at least has not traditionally denied them.... What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child. We are not aware of a single case, old or new, that has done so." *Id.* at 126–27, 109 S.Ct. 2333. The Court further explained that the biological father's putative constitutional right to establish paternity of his daughter was limited "by the circumstance that the mother is, at the time of the child's conception and birth, married to, and cohabitating with, another man, both of whom wish to raise the child as the offspring of their union." *Id.* at 129, 109 S.Ct. 2333. It should be noted that Justice O'Connor, joined by Justice Kennedy,

refused to join footnote 6 of Justice Scalia's opinion for the Court, which laid out "a mode of historical analysis to be used when identifying liberty interests protected by the Due Process Clause ... that may be somewhat inconsistent with our past decisions in this area." *Id.* 132, 109 S.Ct. 2333 (O'Connor, J., concurring in part).

Even if this Court assumes that the *Michael H.* plurality's substantive due process reasoning constitutes binding precedent, it is clear that the situation presented in this case is distinguishable from that presented in *Michael H.* First, *Michael H.* was about the rights of the biological father vis-a-vis the biological mother, whereas this case presents a dispute between a biological parent and non-parents. Second, the historical analysis endorsed in *Michael H.* also favors Suboh. Although there may not be cases granting paternity to a biological father in the face of the opposition of the biological mother and her husband, there are certainly cases granting parental rights or custody to a biological parent in the face of the opposition of adoptive parents, even where the adoptive parents have *not* kidnapped the child. *See, e.g., Mayberry v. Flowers*, 347 Ark. 476, 65 S.W.3d 418, 419 (2002); *In re A.J.F.*, 764 So.2d 47, 55, 62 (La.2000); *Matter of Adoption of Baby Boy*, 175 Misc.2d 7, 667 N.Y.S.2d 635, 640–41 (1997). Here, the Kandys not only allegedly kidnapped Sofia, but it is undisputed that they never legally adopted her, thus making Suboh's case even stronger. Accordingly, the Court rejects Borgioli's argument that *Michael H.* must be interpreted so broadly as to mean that Suboh did not have a protectable interest in the custody of her daughter.

3. Borgioli has argued that Suboh, in order to make out a procedural due process claim, also had to show "that Borgioli's conduct was intentional or reckless and 'shocked the conscience' of the jury." Def.'s Opp'n at 7; *see Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Frankfurter, J.) (origin of the "shocks the conscience" formulation in substantive due process cases). Such a requirement, however, applies only to one category of substantive due process claims, *see, e.g., Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991), and is inapplicable to procedural due process claims. *See, e.g., Lamoureux v. Haight*, 648 F.Supp. 1169, 1176 n. 1 (D.Mass.1986) (Wolf, J.) ("If a procedural due process claim were proven, it would be unnecessary to consider whether the procedural

the Court's instructions to the jury, however, the Court told the jury that, on the issue of whether Borgioli violated Suboh's due process rights, the question was: "Would a reasonable officer have concluded on the facts before him that the Kandys had undisputed custody of Sofia despite Mrs. Suboh's claims and that no process of any sort was due before Sofia could be released to the Kandys?" 3/04/03 Tr. at 17. The Court explicitly charged the jury that Suboh bore the burden of proof as to this question, telling them that "[o]n each of the things that I'm going to tell you has to be proved, it's Mrs. Suboh that has to prove them." *Id.* at 11.

This charge, the Court now recognizes, was erroneous. Suboh did not bear the burden of showing that Borgioli's behavior toward her was not reasonable. That simply was not an element of her case. Reasonableness would only be relevant if the question were whether it was appropriate to provide merely a post-deprivation hearing as opposed to a pre-deprivation hearing. When, as here, the claim is that a parent's procedural due process rights were violated because she received no hearing *whatsoever* in regard to the loss of custody of her child, a showing of "lack of reasonableness" is not required or even implicated.

That being said, "reasonableness" was not entirely out of the equation in this case. It still had a role—by means of qualified immunity—in determining whether Mouna could *recover* from Borgioli for his violation of her procedural due process rights. This, however, was a question for the Court—not the jury.

Pursuant to *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials "are generally shielded from civil damages liability under the principle of qualified immunity so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kelley v. LaForce,* 288 F.3d 1, 6 (1st Cir.2002) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727) (internal quotation marks omitted). Qualified immunity is an affirmative defense upon which the defendant bears the burden of proof, *see, e.g., DiMarco–Zappa v. Cabanillas,* 238 F.3d 25, 35 (1st Cir.2001) (citing *Harlow,* 457 U.S. at 815, 818, 102 S.Ct. 2727), and is a question of law for the Court, *see, e.g., Suboh,* 298 F.3d at 90.

At the summary judgment stage, this Court ruled—and the First Circuit affirmed—that Borgioli was not entitled to summary judgment on qualified immunity grounds. *Suboh,* 298 F.3d at 96–97. Qualified immunity did not, however, completely fall out of the case once the First Circuit affirmed that it was not warranted on summary judgment. On the contrary, to the extent that there were still facts in dispute that were arguably determinative as to whether a reasonable officer would have believed (erroneously), like Borgioli, that no process of any sort was due to Suboh, Borgioli still had the affirmative defense of qualified immunity available to him. *See id.* at 90.

Rather than putting the question of reasonableness directly to the jury, however, this Court instead should have asked the jury to resolve any remaining relevant factual disputes bearing on reasonableness, and then ruled on the ultimate question of qualified immunity itself. *See, e.g., Singh v. Blue Cross/Blue Shield of Massachusetts,* 308 F.3d 25, 35 n. 9 (1st Cir.2002) ("Several courts have indicated that if factual disputes underlie a qualified immunity determination, a judge may issue 'special

due process violation was so egregious as to 'shock the conscience.' ").

interrogatories to the jury as to the disputes of fact.' Though we have not explicitly adopted this approach, ... we have expressed approval of it." (internal citations and quotation marks omitted)); *Kelley,* 288 F.3d at 7 ("Although [w]e recognize that the immunity question should be resolved, where possible, in advance of trial, pre-trial resolution sometimes will be impossible because of a dispute as to material facts. In such a case, the factual issues must be decided by the trier of fact, thereby precluding summary judgment. Only after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella." (alteration in original) (footnote and citations omitted) (quoting *Swain v. Spinney,* 117 F.3d 1, 9–10 (1st Cir.1997)) (internal quotation marks omitted)); *St. Hilaire v. City of Laconia,* 71 F.3d 20, 24 n. 1 (1st Cir.1995) ("The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury. But if there is a factual dispute, that factual dispute must be resolved by a fact finder." (quoting *Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991)) (internal quotation marks omitted)).

As such, this Court's charge to the jury—essentially importing a reasonableness test into Suboh's burden of showing that her procedural due process rights were violated—was erroneous in two respects. The issue of reasonableness was relevant *only* to the question of qualified immunity, a question of law for the Court (not the jury) on which Borgioli (not Suboh) bore the burden of proof.[4]

## 2. Was this plain error?

■ Suboh concedes that she failed to object to the charge, after it was given, in regard to the above-described two related errors.[5] Given the lack of a timely objection, this Court can only grant a new trial on account of the erroneous jury instructions if those instructions constituted plain error. *See Wilson v. Mar. Overseas Corp.,* 150 F.3d 1, 6 (1st Cir.1998) ("Thus, [s]ilence after instructions ... typically constitutes a waiver of any objections. It must be emphasized that [i]t is an ironclad rule in this circuit that failure to renew objections *after* the charge constitutes waiver of any claim of error.... The failure to preserve objections does not entirely preclude our review. In such cases, however, we review only for plain error." (alterations in original) (quoting *Putnam Res. v. Pateman,* 958 F.2d 448, 456 (1st Cir.1992), and *United States v. Richardson,* 14 F.3d 666, 670–71 (1st Cir.1994)) (citations and internal quotation marks omitted)).

■ The requirements for plain error are that there be error, that it be plain or obvious, that it affected substantial rights (that is, that it affected the outcome of the district court proceedings), and that the error threaten a "miscarriage of justice" or something akin to it. *See, e.g., Chestnut v. City of Lowell,* 305 F.3d 18, 20 (1st Cir. 2002); *Wilson,* 150 F.3d at 6–7; *cf. Unit-*

---

**4.** For a further discussion of Borgioli's qualified immunity, *see infra* pp. 205–06.

**5.** Suboh's counsel did object to the Court's answer to one of the jury's questions, but this objection was not relevant to the two related errors discussed above. Specifically, Suboh's counsel stated that "My objection for the rec-

ord would be to the instruction in response to the question was it legal for Borgioli to give Sofia to the Kandys and I would have requested, I believe the proper instruction would have been no, it was not legal for Borgioli to give Sofia to the Kandys without affording a judicial hearing." 3/5/03 Tr. at 12.

ed States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (describing this as the test for plain error under Federal Rule of Civil Procedure 52(b)). The First Circuit has stated that this standard should be applied particularly rigorously in the context of failures to object to jury instructions, given the statement in the Federal Rules of Civil Procedure that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R.Civ.P. 51. As the First Circuit has put it, "The plain error standard, high in any event, is near its zenith in the Rule 51 milieu." Toscano v. Chandris, S.A., 934 F.2d 383, 385 (1st Cir.1991) (citations omitted). Moreover, the First Circuit has stated that "in this circuit, it is rare indeed for a panel to find plain error in a civil case." Chestnut, 305 F.3d at 20.

Suboh has suggested that although the First Circuit's standard of review in such an instance would certainly be governed by plain error, this Court—as a district court—has greater discretion to grant a new trial. Pls.' Mem. at 19 [Docket No. 178]. There is one case that somewhat supports this position by implication. See Chakrabarti v. Cohen, 31 F.3d 1, 5 (1st Cir.1994) ("The [district] judge thought that fairness required a fresh start on damages, and he noted that neither side had properly advised him on the no-punitive damages rule. A new trial on damages was arguably the right course and was certainly not an abuse of the trial court's broad discretion to order new trials."). The vast bulk of the case law, however, suggests that the same rigorous plain error standard applies to district courts reviewing their own charges. See,

e.g., Steinhilber v. McCarthy, 26 F.Supp.2d 265, 278 (D.Mass.1998) (Bowler.M.J.) (stating that the plain error standard applies in cases involving erroneous instructions to which a party moving for a new trial did not properly object); see also, e.g., ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F.Supp.2d 622, 669 (E.D.Pa.2003) (stating that "a district court also must utilize plain error review when deciding whether to grant a reversal or new trial based on objections untimely raised"); Busch v. County of Volusia, 189 F.R.D. 687, 696 (M.D.Fla.1999) (applying plain error standard); DeWitt v. New York State Hous. Finance Agency, 1999 WL 672560, at *1 (S.D.N.Y.1999) (same).

Chakrabarti implies nothing to the contrary. First, the district judge's decision to award a new trial in that case was consistent with application of the plain error rule, and the appeals court can be understood as quickly determining that the district court had correctly applied that rule. In Chakrabarti, a jury had awarded the plaintiff $1 in nominal damages and $30,000 in punitive damages on an interference with business relations claim. 31 F.3d at 3. The plaintiff had provided evidence that the defendants had caused him emotional distress, and he sought relief both under an intentional infliction of emotional distress claim and as "tack-on" damages in his interference with business relations claim. Id. The district judge ordered a retrial because, although neither of the parties had raised the issue at trial, Massachusetts law did not permit punitive damages for such claims. Id.[6] The judge chose this course, rather than entering judgment for $1 and striking the punitive damages award, because he felt there was a substantial risk that the jury had credited the emotional distress evidence, but due

---

6. The second jury awarded $75,000 in dam-

ages. Chakrabarti, 31 F.3d at 5.

to the judge's misinstruction the jury had simply provided relief for that distress in the form of punitive damages. *Id.* at 5. Under the plain error standard, it can reasonably be said that an error regarding availability of punitive damages is "plain or obvious," and that such an error could well have affected the outcome to an extent that threatens a "miscarriage of justice."

 Second, the fact that a district court can be affirmed for awarding a new trial in circumstances where the appeals court would not have done so (or vice versa) does not mean that the two courts are applying different legal standards. The appeals court reviews a district court's award of a new trial under an abuse of discretion standard. *See, e.g., Chakrabarti,* 31 F.3d at 5. The district court exercises its discretion to award a new trial by applying the plain error standard to its own decisions during the original trial, and the appeals court must then determine whether the district court's application of that same plain error standard was reasonable. As a practical matter, a district judge may thus be able to "get away with" applying the correct standard in a manner somewhat more or less strict than what a majority of appeals court judges would do, were they sitting as district court judges or confronting at the appellate level a newly-raised argument that might justify awarding a new trial. It is an interesting philosophical, political, empirical, and psychological question whether this phenomenon in reality results from district judges covertly applying a "different" legal standard, from the inevitable inability of language to convey a legal standard (or anything else) with pinpoint accuracy, or from the tendency of any two individual judges to interpret one set of facts differently (due to differences in experience, disposition, etc.). It suffices to say, however, that as a practical matter this question also

infects appellate review of other exercises of district court discretion, as well as review of district court factfinding, and that American jurisprudence can and does differentiate between the question whether the legal standard applied was the correct one and the question whether an admittedly correct legal standard was applied in a reasonable manner. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 405–08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (O'Connor, J., opinion of the Court) (discussing this distinction in the context of interpreting and applying Antiterrorism and Effective Death Penalty Act provisions governing relief from state court criminal convictions).

*Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980), which Suboh cites, is similarly consistent with the understanding that district courts must apply the plain error standard, to the extent it is even on point. Suboh correctly quotes *Allied Chemical Corp.* as saying that "[t]he authority to grant a trial, moreover, is confided almost entirely to the exercise of discretion on the part of the district court." Pls.' Mem. at 19 (quoting 449 U.S. at 36, 101 S.Ct. 188). The next sentence in the case provides important context, however: "Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is clear and indisputable." *Allied Chemical,* 449 U.S. at 36, 101 S.Ct. 188 (citation and internal quotation marks omitted). The Supreme Court's point is not that district courts can be more liberal in awarding new trials than appellate courts, but rather that the discretionary nature of decisions regarding award of a new trial is one of several considerations that makes reversal of such decisions via a writ of mandamus especially inappropriate. *See id.* The Supreme Court's recognition that district courts have discretion, and that discretionary judgments are reviewed

for abuse of discretion, says nothing about what legal standard governs the exercise of that discretion, or whether district courts and appellate courts should apply different legal standards.

 Thus, applying the plain error standard, this Court must consider whether the two errors in the jury charge rise to the level of plain error. The Court concludes that its error in delegating the question of qualified immunity to the jury does not constitute plain error warranting a new trial. Although this was certainly error, Suboh's rights were not substantially affected in that this was an error that was arguably neutral in terms of prejudice as between her and Borgioli. The Court's error in imposing upon Suboh the burden of showing Borgioli's unreasonableness, however, is far more grave. As explained above, the undisputed facts in this case made clear that Suboh's procedural due process rights were, by definition, violated, but the Court instructed the jury that it could only so find if it also concluded that Borgioli's behavior had not been reasonable. Thus instructed, the jury subsequently returned a verdict in Borgioli's favor. Had this Court not committed that error, the *only* question put to the jury would have regarded the scope of damages, if any, that Borgioli's violation can be considered to have proximately caused. The Court thus concludes that Suboh was prejudiced by the erroneous imposition of this burden upon her.

 The Court must therefore consider whether this error meets the final prong of the plain error standard: miscarriage of justice. The First Circuit has provided guidance as to the factors to consider in assessing whether there is a miscarriage of justice: namely, "whether the failure to raise the claim below deprived the reviewing court of helpful factfinding; whether the issue is one of constitutional

magnitude; whether the omitted argument is highly persuasive; whether the opponent would suffer any special prejudice; whether the omission was inadvertent or deliberate; and, perhaps most importantly, whether the issue is of great importance to the public." *Play Time, Inc. v. LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 30 n. 8 (1st Cir.1997) (citing *Nat'l Ass'n of Soc. Workers v. Harwood,* 69 F.3d 622, 627–28 (1st Cir.1995), which set forth and described these factors).

The error here satisfies a number of these criteria. It is clear that Suboh's failure to raise this argument was inadvertent and not strategic; the Court can discern no strategic benefit stemming from Suboh's lack of opposition to the imposition of an additional burden upon her. Additionally, there is no special prejudice to Borgioli here, because the omitted argument "is law-based, not fact-based." *National Ass'n of Social Workers,* 69 F.3d at 628. Further, there is no question as to the correctness and persuasiveness of Suboh's argument; Suboh was forced to bear a burden that was not appropriately hers, as discussed above.

Most importantly, the right at issue here is not only a constitutional right; it is in fact one of the most venerable constitutional rights, as the First Circuit stated in *Suboh* itself. *See Suboh,* 298 F.3d at 91 ("Putting aside notions of generalized 'familial integrity,' there are, more pertinently, much more narrow interests that are at stake here. To begin, 'the interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution.'" (internal citations omitted)).

Admittedly, the relevant First Circuit cases defining the "constitutional magnitude" factor involve instances where the claim that the party failed to raise at trial

was in fact the source of the constitutional issue, whereas the argument that Suboh failed to raise is not itself constitutional in nature, but rather tends to make it more likely that she can successfully assert an entitlement to exercise a venerable constitutional right. *See National Ass'n of Social Workers,* 69 F.3d at 628; *United States v. La Guardia,* 902 F.2d 1010, 1013 (1st Cir.1990). This is a distinction without a difference, however. Whether a prisoner is saying that his conviction (and thus imprisonment) is unlawful based on a constitutional argument not raised at a trial, *see La Guardia,* 902 F.2d at 1013, or a mother is arguing what Suboh argues here, the question is whether, had the district court apprehended the law correctly, the person would be entitled to exercise some aspect of the liberty that the Constitution guarantees to us all. Such an understanding gives greater independent meaning to this factor, as limiting this factor to constitutional arguments would often make it superfluous in light of the "public interest" inquiry.

Additionally, as Suboh has pointed out, there are criminal cases as well as even some civil cases (albeit not from the First Circuit) in which an erroneous jury instruction as to the burden of proof was found to constitute plain error. *See, e.g., United States v. Colon–Pagan,* 1 F.3d 80, 81 (1st Cir.1993) (Breyer, C.J.) (holding that a district judge's erroneous jury instruction in regard to the definition of proof beyond a reasonable doubt constituted plain error warranting a new trial); *United States v. Paniagua–Ramos,* 251 F.3d 242, 246 (1st Cir.2001) (noting that "plain error is theoretically possible with respect to an omitted jury instruction. If, say, a trial court fails to instruct a criminal jury on a basic point like the government's burden of proof or the presumption of the defendant's innocence, the lack of a contemporaneous objection would not fore-

close searching appellate review."); *Melton v. City of Oklahoma City,* 928 F.2d 920, 927 (10th Cir.1991) ("[T]he plaintiff was permitted to recover a substantial verdict without carrying the entire burden of proof placed upon him. We believe the instruction created plain error ...."); *Batka v. Liberty Mut. Fire Ins. Co.,* 704 F.2d 684, 689–90 (3d Cir.1983) (holding that the trial court's erroneous instruction that a preponderance of the evidence standard was applicable in a particular civil case was "fundamental and highly prejudicial," and required a new trial); *Ostrov v. Metro. Life Ins. Co.,* 379 F.2d 829, 838 & n. 10 (3d Cir.1967) (similar); *but see Pulliam v. Tallapoosa County Jail,* 185 F.3d 1182, 1188 (11th Cir.1999) ("In this case, the failure to give an instruction on Defendant's burden of proof does not constitute plain error. Plaintiff has failed to convince us that, given a completely accurate instruction on the burden of proof in mixed-motives issues, a substantial likelihood exists that the jury would have found for Plaintiff and determined that Plaintiff—in the absence of retaliation—would not have been fired." (footnote omitted)).

 There is an additional wrinkle. Like many judges, my practice since my days on the Massachusetts Superior Court has been to go back to the jury room after the verdict has been delivered personally to thank the jurors for their service. I did so in this case.

The jurors, I saw, had carefully taped to the wall large panels of blank paper (routinely provided) and marked each one progressively with the essential factual issues in this case. The final two panels were entitled "Proximate cause" and "Damages" in that order. Under the title "Proximate cause" was written "*NO.*" There was no writing on the "Damages" panel. In light of the defendant's verdict, I am convinced

that the jury, properly charged on the concept of proximate cause, did manifest justice after a detailed and ably tried case. But wait. None of the data recited in this paragraph is competent evidence to impugn a jury verdict. Fed.R.Evid. 606(b).

Here, of course, the data serve to uphold the verdict. Nevertheless, as the history of this evidentiary rule emphasizes that such data are simply incompetent regardless of their truth, I conclude I cannot consider them at all.

Disregarding the observations made in the jury room post-trial, and for all of the compelling legal reasons—most importantly, the great significance of the constitutional right at issue here—the Court concludes that this, like *Chestnut,* is the "rare civil case where the miscarriage of justice requirement is met," *Chestnut,* 305 F.3d at 20, and a new trial is warranted.

## B. Framework of the New Trial

Having concluded that a new trial is warranted in this case on the grounds that the jury instructions were plainly erroneous, the Court must now address the framework of that new trial. As noted above, at the hearing on the instant motion, the Court ruled that if a new trial were ordered, Borgioli would not be entitled to qualified immunity. 4/8/03 Tr. at 11–12. The Court now addresses the basis of that ruling.

In its opinion on this case, the First Circuit ruled that it was clearly established as of 1998 that "a state official could not effectively resolve a disputed custody issue between a parent and another without following any due process procedures at all," *Suboh,* 298 F.3d at 94–95. It then indicat-

ed that the relevant question, in determining whether Borgioli was entitled to qualified immunity, was whether "a reasonable officer could have concluded on the facts before him that the Kandys had undisputed custody of the child, despite Suboh's claims, and so no process of any sort was due before the child could be released to the Kandys." *Id.* at 96.

By framing the issue in such a way, the First Circuit necessarily reduced the scope of facts determinative to the qualified immunity analysis. Were there, for example, a genuine dispute as to whether Suboh told Borgioli that she was Sofia's biological mother or that she wanted custody of her daughter, the jury would indeed be needed to resolve these crucial questions. To the extent that the determinative facts were unclear or disputed prior to the trial, however, that dispute was resolved by Borgioli's own trial testimony. As noted above, on the stand Borgioli testified that Suboh told him that she was Sofia's biological mother, that she had not signed any papers giving custody of Sofia to her parents, and that she wanted to regain custody of her daughter. Regardless of the apparent credibility or lack thereof of Suboh's statements,[7] the Court fails to see how any reasonable officer could not have, at a minimum, concluded that there were indeed competing claims to Sofia's custody such that he simply could not decide the dispute himself. Borgioli argues that "there was certainly a hotly contested factual dispute as to what [he] knew at various points in his investigation," Def.'s Opp'n at 11 [Docket No. 179], but it is undisputed that the crucial piece of information—that Suboh was claiming to be

---

**7.** For his part, Borgioli has testified that he was "fairly reasonably sure" that Suboh was indeed Sofia's mother, 2/26 Tr. at 49. He further testified that he "didn't disbelieve" Suboh's claim that she wanted custody of her

daughter, but that he believed that "if the parents paid the money for the daughter, the daughter would have been returned to the Kandys." *Id.* at 23.

Sofia's biological mother and was asserting a right to custody of her daughter—was known to Borgioli when he decided to place Sofia in the custody of the Kandys.

Accordingly, at this point, there are simply no remaining factual disputes that a jury needs to resolve for the Court to be able to rule on qualified immunity, given Borgioli's own testimony. In such a circumstance, it is appropriate for the Court to rule on qualified immunity straightaway, *see Ringuette v. City of Fall River*, 146 F.3d 1, 6 (1st Cir.1998) (describing as "eminently sensible" a district court's decision to dismiss on qualified immunity grounds, even though it resolved a relevant factual dispute in the process), and that is what the Court has done here.

Given the Court's determinations that (1) the undisputed facts of this case establish that Suboh's procedural due process rights were violated by her failure to receive any hearing attendant to the loss of custody of her daughter; and (2) the undisputed facts demonstrate that Borgioli is not entitled to qualified immunity, the scope of the new trial is necessarily limited. All that remains for the new trial is the important question of what—if any— damages were proximately caused by Borgioli's violation of Suboh's procedural due process rights.

## IV. CONCLUSION

I deeply regret that my own error has so compounded the expense and delay visited on the litigants in this action. Nevertheless, we live under "the rule of law, and the just application of the law to the facts of the case lies at the very heart and core

of our civilization." [8] Accordingly, for the reasons set forth above, the Plaintiff's Motion for a New Trial [Docket No. 178] is GRANTED. The Court further rules that Suboh has established that her procedural due process rights were violated by Borgioli, and that Borgioli is not entitled to qualified immunity. A new trial will therefore be held on the issue of the amount of damages, if any, that were proximately caused by Borgioli's violation of Suboh's procedural due process rights.

SO ORDERED.

---

**8.** Adapted from the charge to the jury of Chief Justice Walter H. McLaughlin in *Commonwealth v. Bumpus*. (The case was affirmed, 362 Mass. 672, 290 N.E.2d 167 (1972), reversed and remanded by the United States Supreme Court in light of new case law, 411 U.S. 945, 93 S.Ct. 1941, 36 L.Ed.2d 407 (1973), and affirmed once again, 365 Mass. 66, 309 N.E.2d 491 (1974).) I incorporate this language into the beginning of the jury charge in every criminal case.